**E. F. HUTTON & COMPANY, Inc.,**
**Plaintiff,**

v.

**John D. BROWN, Defendant.**

**Civ. A. No. 68–H–592.**

United States District Court
S. D. Texas,
Houston Division.

Sept. 18, 1969.

Bracewell & Patterson, Houston, Tex., for plaintiff.

Reynolds, White, Allen & Cook, Houston, Tex., for defendant.

## MEMORANDUM OPINION

### I. PREFACE

NOEL, District Judge.

*A. Introduction*

Plaintiff E. F. Hutton & Company, Inc. ("Hutton"), a national brokerage

firm, brought this action against defendant John D. Brown, its former Houston regional vice-president, for alleged negligence and breach of fiduciary duty to the corporation. Jurisdiction exists under 28 U.S.C. § 1332 as to the entire case, and under 28 U.S.C. § 1331 as to a portion of the case.

In this litigation Hutton is represented by a Houston law firm (hereinafter called "the Houston firm"), which appears as Hutton's counsel of record. Hutton's corporate general counsel, Cahill, Gordon, Sonnett, Reindel & Ohl of New York City (hereinafter called "the New York firm") has not entered a formal appearance and does not appear "of Counsel" on the pleadings filed by the Houston firm on Hutton's behalf, but (as will be shown later in more detail) has participated in the investigation of Hutton's claim against Brown and in Hutton's prosecution of this litigation. Defendant Brown has moved to disqualify both of these firms from continuing to represent or to advise Hutton in connection with this litigation and to enjoin them from turning over certain information in their files to Hutton or to new counsel whom Hutton may retain.

In part, this litigation is an outgrowth of the collapse of Westec Corporation in August, 1966. In late July or early August, a man named John Hurbrough approached Brown seeking a substantial loan from Hutton to be secured by Westec common stock. After negotiations, Brown authorized and made a loan to Hurbrough in the amount of $650,000, and caused Hutton to lend that sum to Hurbrough upon receipt of the collateral. Shortly after the loan was completed, however, the American Stock Exchange and the Securities and Exchange Commission (SEC) suspended trading in Westec stock. In due course, Brown and other Hutton personnel were asked by the SEC to testify in a formal investigation into the internal affairs of Westec and into trading in Westec stock. Subsequently, these same personnel were asked to testify at public hearings instituted by Westec's trustee in bankruptcy. In accordance with its usual practice in such cases, the New York firm dispatched one of its members (hereinafter called "the New York partner") to accompany Brown to each hearing. A member of the Houston firm (hereinafter called "the Houston partner") also accompanied Brown to the bankruptcy hearing.

With the suspension of trading, the value of the Westec stock given as collateral, evaporated. Hutton sought through negotiations to obtain either additional collateral or repayment from Hurbrough. Its efforts were fruitless. Ultimately, Hurbrough filed suit against Hutton and others, seeking against Hutton a declaration that the loan agreement was unenforceable.[1]

Several months after the Hurbrough suit was filed, Hutton terminated Brown's employment on the advice of counsel and commenced this action. The complaint alleges that Brown was negligent in authorizing and making the Hurbrough loan, and that he also breached his fiduciary duty to the corporation by failing to supervise an account executive adequately, a failure which allegedly resulted in the embezzlement of substantial sums of money from Hutton.[2]

In this litigation, the Houston partner is counsel of record for Hutton. As more fully appears hereafter, the New York partner and other members of the New York firm have cooperated with the Houston partner in the preparation and presentation of Hutton's case. Shortly after suit was filed, Brown's present attorney requested the Houston partner and his firm to withdraw from further representation of Hutton in this litigation. The Houston partner refused, whereupon Brown filed the pending motion.

---

1. John H. Hurbrough v. Moroney, Beissner & Co., et al., Civil No. 67–H–576, S.D.Tex. (Hannay, J., presiding).

2. There has been no suggestion that Brown's two alleged derelictions are related.

In support of his motion to disqualify, Brown asserts that the New York and Houston partners represented him individually when he appeared at the SEC and bankruptcy hearings and testified about the Hurbrough loan transaction. He asserts that the instant lawsuit may well turn in substantial part on his understanding of that transaction, and contends that counsel's continued representation of Hutton violates their subsisting duty to him as their former client. In opposition, Hutton denies that the partners ever represented Brown individually, and contends that even if they did, Brown is not now entitled to insist on their disqualification.

Exhaustive briefs and affidavits have been submitted by both parties. Brown has submitted an affidavit and supplementary affidavit of his own, an affidavit of his present counsel, and an affidavit prepared by the attorney for the Westec trustee who examined him at the bankruptcy hearing. The affidavits submitted by Hutton include one by the New York partner, one by an associate of the New York firm (hereinafter called "the New York associate"), one by the Special Master who presided over the bankruptcy hearing, and an affidavit and two supplementary affidavits by the Houston partner. In addition, the record of this case includes two copies of the transcript of the bankruptcy hearing,[3] and the Court has also referred to the transcript of Brown's testimony in the SEC proceeding.[4]

Both Hutton and Brown have stated in their briefs that they consider this record complete, and neither has asked to offer any live testimony or requested an evidentiary hearing. Although each originally requested oral argument, both later waived oral argument and agreed to submit the motion on the lengthy briefs already filed.

After careful consideration of the briefs, affidavits, and transcripts, the Court granted Brown's motion to disqualify, but denied the requested injunctive relief. Thereafter, Hutton filed a motion to reconsider, and offered further argument with reference to the Houston partner's appearance with Brown at the bankruptcy hearing. In this motion, which will be denied, Hutton urges contentions which will be discussed in conjunction with the issues raised by the motion to disqualify.

Many of the issues raised by Brown's motion to disqualify have generated well established rules, for the attorney's duty not to represent conflicting interests nor to discharge inconsistent obligations has long been recognized. In the first place, courts agree that the duty to avoid conflicts subsists after the attorney-client relationship which caused it to arise has ceased.[5]

The proper method for a litigant to bring the issue of a conflict of interest before the court is by a motion to disqualify.[6] Although a court's authority to disqualify counsel is based upon its duty to supervise the conduct of the attorneys practicing be-

---

3. Testimony of the witness John D. Brown, Aug. 30, 1967, *In re* Westec Corp., Debtor, Bankruptcy No. 66–H–62, S.D.Tex. (Hannay, J., presiding). Both parties have attached copies of this transcript to pleadings on file in this cause.

4. Pursuant to regulation and policy of the SEC, *see* 17 C.F.R. § 203.6, a copy of the transcript of the hearing was not made available to Brown or Hutton. However, upon authorization of Brown without objection by Hutton, a copy of the transcript was furnished to the Court by the SEC.

5. Extensive annotations on this subject are found at 52 A.L.R.2d 1243 (1957); 7 C.J.S. Attorney and Client § 48 (1937); and 7 Am.Jur.2d Attorneys at Law § 156 (1963). The subject is also discussed at length in H. Drinker, Legal Ethics 103–30 (1953) [hereinafter cited as Drinker] and R. Wise, Legal Ethics 137–56 (1966) [hereinafter cited as Wise].

6. International Bhd. of Teamsters v. Hoffa, 242 F.Supp. 246, 257 (D.D.C.1965); 3 N.Y.Jur. Attorney and Client § 75 (Supp.1969).

fore it,[7] a motion to disqualify normally can be made only by a former client.[8] Moreover, a former client may move to disqualify only if the subject of the adverse representation is substantially related to the subject of the former one.[9]

In this case it is undisputed that Brown's role in the making of the Hurbrough loan was the subject of lengthy questioning at both hearings at which he testified. The parties also agree that this issue may become one of the material issues here. These stipulations establish the requisite relationship between the alleged prior representations and the current adverse representation, but three issues presented by the motion to disqualify remain to be resolved:

(1) Whether Brown is a former client; *i. e.*, whether the New York and Houston partners represented him individually, as well as the corporation, at the SEC and bankruptcy hearings.

(2) Whether corporate counsel who have represented a corporate officer individually should be disqualified even though all of the officer's communications with counsel were intended to be conveyed to his corporate employer and were made for the benefit of the corporation.

(3) Whether the requested injunction should issue.

The Court answers the first two of these questions in the affirmative, and will direct present counsel for plaintiff to terminate their representation of plaintiff in this case and to refrain from aiding, consulting or advising new counsel retained by plaintiff, except to the limited extent reasonably necessary to the transfer of their duties to new counsel. The request for an injunction will be denied.

One preliminary matter remains. In its opposition to Brown's motion, Hutton has not questioned the Court's power to grant any of the relief Brown seeks, although it has defended the motion vigorously on the merits. Similarly, in

---

7. *See, e. g.,* Sanders v. Russell, 401 F.2d 241, 246 (5th Cir. 1968); Cord v. Smith, 338 F.2d 516, 524 (9th Cir. 1964). The American Bar Association and most state bar associations have adopted canons of ethics or other standards of professional responsibility to govern the conduct of attorneys. The canons of the ABA [hereinafter called the ABA Canons] were replaced in August 1969 by an entirely new Code of Professional Responsibility [hereinafter called the CPR]. Although the ABA Canons (and now the new CPR) have no statutory force, they are indicative of and reflect the attitude of the profession as a whole upon the standards of conduct of its members, Herman v. Acheson, 108 F. Supp. 723 (D.D.C.1952), aff'd sub nom. Herman v. Dulles, 92 U.S.App.D.C. 303, 205 F.2d 715 (1953); *cf.* Ex parte Burr, 9 Wheat. (22 U.S.) 529, 6 L.Ed. 152 (1824), and form the model for the canons adopted by most states, including Texas and New York. *See* Tex. Bar Ass'n, Rules & Canons of Ethics, reprinted following the State Bar Act, Vernon's Ann.Tex.Rev.Civ.Stat. art. 320a–1 (1959) [hereinafter called the Texas canons]; N.Y. Canons of Ethics, reprinted in McKinney's Judiciary Law App. at 407 (1968). The Texas canons, many of which are substantially identical to the ABA canons, have been held to be quasi-statutory, having the force of statute in cases to which they apply. Touchy v. Houston Legal Foundation, 417 S.W.2d 625 (Tex.Civ.App.—Waco 1967), rev'd on other grounds, 432 S.W. 2d 690 (Tex.1968). Although the ABA or local canons have been adopted by some federal courts by rule of court, *see, e. g.,* T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265, 268 n. 4 (S.D.N.Y.1953) (Southern District of New York), this practice has not been followed in the Southern District of Texas. This Court is therefore not bound by the judgments of Texas courts or the opinions of grievance committees, *accord,* Cord v. Smith, 338 F.2d 516, 524 (9th Cir. 1964), although it has found many of those decisions highly persuasive.

8. Murchison v. Kirby, 201 F.Supp. 122 (S.D.N.Y.1961); Cloer v. Superior Court, 271 Cal.App.2d 173, 76 Cal.Rptr. 217 (1969). *Contra,* Empire Linotype School, Inc. v. United States, 143 F.Supp. 627, 631 (S.D.N.Y.1956); *cf.* Marco v. Dulles, 169 F.Supp. 622, 632–633 n. 7 (S.D. N.Y.), appeal dismissed, 268 F.2d 192 (2d Cir. 1959).

9. Murchison v. Kirby, *supra* note 8.

arguing to the Court that the relief he seeks should be granted, Brown has done no more than cite and discuss previous decisions in which courts have granted motions to disqualify.

The Court has given very careful consideration to the question of its power to grant relief, particularly against the New York attorneys. The reported decisions are far from satisfactory. Courts asked to entertain motions to disqualify invariably have not considered whether an order of disqualification would be enforceable. This apparently is a question which is left unresolved pending subsequent enforcement proceedings. Upon reflection, this Court believes the better course to be to resolve this issue now, and will conclude this preface by discussing its power to grant the relief sought by Brown.

Following the discussion of jurisdiction, in the central portion of this necessarily extended memorandum opinion, the events which occurred at the SEC and bankruptcy hearings will be found as facts, as a predicate for finding the ultimate fact of representation. The remainder of the opinion will be devoted to a discussion of the issues raised by the parties' respective legal positions.

In making its findings of fact, the Court has relied primarily on the transcripts of the two hearings at which Brown appeared and the undisputed facts set out in the pleadings and affidavits filed by the parties. Where the parties have disagreed, except as is otherwise manifest, the Court has accepted Hutton's statement of the facts. Only in determining the inferences to be drawn from the undisputed facts and the facts alleged by Hutton has the Court exercised its independent judgment.

## B. Jurisdiction

In his motion to disqualify, Brown requests that the Court restrain the New York and Houston firms from representing Hutton in any capacity in connection with this litigation and enjoin them from turning over certain information in their files. The issue presented by this motion, whether an order of disqualification should be issued, is one which may be resolved into three subissues: (1) Whether Brown is entitled to relief. (2) Whether this Court is empowered to frame appropriate relief. (3) Whether an order of this Court would be enforceable against Hutton and its counsel, if relief is granted. The parties have briefed and argued only the first of these issues. It is discussed in parts II and III of this memorandum opinion.

The second subissue, the Court's power to frame appropriate relief, is not questioned, and indeed could not be disputed. Attorneys such as the Houston partner who appear before a court are subject to its disciplinary power, a power which authorizes the court to regulate the practice of law both within and without the courtroom.[10] And while no member of the New York firm has appeared formally before this Court in this cause, Brown alleges on information and belief, as his basis for moving to disqualify the New York firm, that that firm is advising Hutton and consulting with the Houston firm in connection with the prosecution of this lawsuit. This Court's "inherent power to manage its affairs"[11] is broad enough to reach such conduct, which can only be intended to influence the course of litigation pending before it. *Accord*, Sanders v. Russell, 401 F.2d 241, 246 (5th Cir. 1968). Moreover, had Brown requested the Court to enter an injunc-

---

10. Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968) ; Cord v. Smith, 338 F.2d 516 (9th Cir. 1964), mandate clarified, 370 F.2d 418 (9th Cir. 1966) ; *In re* Fletcher, 71 App.D.C. 108, 107 F.2d 666, cert. denied, 309 U.S. 664, 60 S.Ct. 593, 84 L.Ed. 1011 (1939).

11. Flaksa v. Little River Marine Construc. Co., 389 F.2d 885, 888 (5th Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).

tion against Hutton, restraining Hutton from permitting its present counsel to advise it further in connection with this litigation, the all writs act [12] would confer power to do so. This Court therefore answers the second subissue in the affirmative.

Turning to the third subissue, Hutton and its Houston counsel are subject to the orders of this Court because they are present in this District. The New York attorneys, however, are not resident and have not been admitted to practice generally in this District. Moreover, they have not moved for or been granted leave to appear as counsel in this particular cause, and have not affixed their names to any pleading or brief filed on behalf of Hutton. The enforceability of an order disqualifying attorneys such as these, nonresidents alleged to be representing a party litigant in connection with pending litigation, is a question on which the Court has encountered no authority in the rules, the decisions, or the applicable statutes. But because this Court has the power to frame and issue an order disqualifying these attorneys, such an order will be enforceable against them if its issuance against them comports with due process. And although no court has defined what process is due, this question may be likened to the one which arises when a court in one state is asked to give full faith and credit to a judgment obtained in another, or when a defaulting litigant attacks a judgment collaterally on the ground that in personam jurisdiction over him was lacking. In such cases the issue to be decided is whether it is fair and just to compel the nonresident defendant to litigate away from home.[13] By analogy, the issue here is whether it is fair and just for this Court to resolve Brown's request that the New York firm be disqualified.

■ A court may proceed against a nonresident defendant if the nonresident's conduct is equivalent to physical presence within the jurisdiction of the court, if the nonresident joins issue without raising any question of jurisdiction, or if the forum state's interest in taking jurisdiction of cases like the one pending before the court is greater than the nonresident's interest in defending the litigation elsewhere.[14] This last issue requires the court to weigh the forum state's interest in affording a remedy against the inconvenience the nonresident will suffer if he is required to appear and defend. Circumstances to be considered include whether "the defendant * * * purposefully avail[ed] himself of the privilege of acting in the forum state or causing a consequence" there,[15] whether the claim arose in the forum state, whether the defendant's conduct gave him the opportunity to benefit from the forum state's law or judicial system, and whether the happening of consequences in the forum state was reasonably to be foreseen.

■ A court's power over attorneys is broader than its jurisdiction over nonresidents generally, for when attorneys undertake to represent parties to pending litigation, they become officers of the court, at least in connection with that litigation. In all other respects, the propriety of resolving a motion such as

12. 28 U.S.C. § 1651(a) (1964) provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

13. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). While this standard was first developed in a case involving a corporate defendant, it has been applied as well to defendants who are natural persons. See generally 2 J. Moore, Federal

Practice ¶ 4.41–1[3], at 1291.56 & n. 22 (2d ed.1964 & Supp.); 4 C.A. Wright & A. Miller, Federal Practice & Procedure § 1069, at 263–66 (1969).

14. See e. g., Curtis Pub. Co. v. Birdsong, 360 F.2d 344 (5th Cir. 1966); Seymour v. Parke, Davis & Co., 294 F.Supp. 1257 (D.N.H.1969). See generally 4 Wright & Miller, supra note 13, § 1069.

15. E. g., Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968).

Brown's should be weighed on the same scale as that used to determine whether in personam jurisdiction over a nonresident defendant exists. For the reasons stated in detail below, the Court concludes that four independent grounds exist which make it proper for this Court to decide Brown's motion to disqualify the New York attorneys: their conduct here has been equivalent to the practice of law in this Court without leave; the New York partner's appearance with Brown at the bankruptcy hearing, albeit without leave of court, constituted the practice of law in this Court and subjected him and his firm to the lawful orders of this Court not only in that case, but in this one; the New York attorneys have submitted to the jurisdiction of this Court by defending the motion to disqualify on the merits; and their conduct here has been sufficient, in view of the necessity for this Court to decide all issues raised by the motion to disqualify, to make it reasonable for this Court to do so.

The propriety of deciding the motion to disqualify the New York attorneys is largely governed by the extent of their involvement in this litigation, and the affidavit submitted by the New York partner in opposition to the motion to disqualify is the most fruitful source of the pertinent facts. In it the partner states that although his firm has not formally appeared in this litigation and has not been served with any papers, it has received copies of the papers served on the Houston firm. Moreover, as Hutton's general counsel, the New York firm has

> for over two years advised Hutton with respect to, and participated in investigations for Hutton of, transactions which are the subject matter of this action; likewise, [the New York firm] (consistent with its fiduciary duties to their client Hutton) has been available to consult with and report to Hutton and to consult with Hutton's Houston counsel who are in

charge of the instant action against Brown.[16]

This statement is quite explicit, but the details of the New York firm's participation in Hutton's investigations, and the nature of the firm's consultation with the Houston firm in the prosecution of this action bear repeating. In their affidavits, the New York partner and associate state that immediately after the suspension of trading in Westec stock, Hutton asked their firm to assist it in conducting an internal investigation. Pursuant to this request, the associate visited Houston twice and conducted a thorough investigation of Hutton's Westec activities in its Houston office. On each of these trips, the associate questioned Brown in great detail. Upon his return from each trip, the associate conferred with the partner and prepared a number of written reports for Hutton's New York management.

It is clear from all of the affidavits submitted by Hutton that such investigation by the New York firm furnished the background information upon which Hutton relied to ascertain the extent of its Westec involvement. The Houston firm's investigation was subsidiary to this one, prompted primarily by Hutton's desire to collect the Hurbrough loan, and later, by its need to defend the Hurbrough lawsuit.

Hutton also asked the New York firm to assist it in complying with the requests of the American Stock Exchange and any governmental regulatory agencies who might be investigating trading in Westec. The firm assembled documents, accompanied Hutton personnel who were called to testify in official investigations, and at least once requested the Houston partner to attend the bankruptcy trustee's public examinations of other witnesses.

In connection with Hutton's suit against Brown, the New York firm has remained in the background, but the affidavits and pleadings submitted by Hut-

16. Affidavit of the New York partner, ¶ 4.

ton suggest the true extent of its participation. The New York partner has submitted a lengthy affidavit, not merely to allege facts within his personal knowledge, but for the purpose of opposing the motion to disqualify.[17] Therein, besides alleging facts within his personal knowledge, he advocates Hutton's position quite fully and forcefully, marshaling the facts (including those set out at length in the associate's affidavit) and arguing a number of legal propositions. If it were not for the absence of citations to legal authority, the affidavit would be a complete brief of Hutton's legal position. The Court has also observed that the briefs and pleadings signed and filed by the Houston partner in opposition to the motion to disqualify assert the rights of both the New York and Houston firms with equal fervor and in many instances adopt the arguments which appear in the New York partner's affidavit.

■ In these circumstances, this Court has no doubt that an order disqualifying the New York attorneys would be enforceable. In the first place, the Court finds that the firm's participation in the prosecution of this lawsuit is sufficient to constitute the practice of law before this Court. The New York partner and his firm have actively represented Hutton in connection with this case, a case which is presently pending in this Court. Their failure to enter a formal appearance as required by Local Rule 6 of the Southern District of Texas[18] does not suspend this Court's disciplinary power over them.[19] They

have submitted to this Court's jurisdiction.

■ In the second place, the Court finds that the New York attorneys' participation in the Westec bankruptcy proceeding, In re Westec Corporation, Debtor, Bankruptcy No. 66–H–62, S.D. Tex. (Hannay, J., presiding), has been sufficient to enable this Court to enter an enforceable order of disqualification here. In that presently pending proceeding, the New York partner entered an appearance for Brown when he accompanied Brown to the hearing at which Brown testified. The hearing was held before a Special Master who had been authorized and directed by the Court to preside over the hearings constituting the trustee's formal investigation. By accompanying Brown to the hearing and entering an appearance on his behalf, the New York partner commenced the practice of law in this Court, albeit without complying with the requirements of Local Rule 6. Moreover, this Court considers the New York partner's entry of an appearance in the bankruptcy proceeding to be equivalent to the entry of an appearance here. The bankruptcy proceeding, the trustee's suit for damages in which both Brown and Hutton are named defendants, Hurbrough's suit in which Hutton is named as a defendant, and this suit, insofar as it is based on the Hurbrough loan transaction, are all part of the same litigation; indeed, Hutton's claim based on the Hurbrough loan transaction constitutes but a claim for indemnity from damages it may incur in other Westec

17. In ¶ 2 of his affidavit, the New York partner states: "I submit this affidavit in opposition to the motion of the defendant in the above-entitled action which motion seeks to (i) disqualify [the Houston firm] from representing their client [Hutton] in this case, and (ii) enjoin both [the Houston firm] and [the New York firm] from assisting or disclosing any information to their client Hutton or to any future Hutton counsel."

18. Local Rule 6 provides: "No attorney who has not been admitted to practice

before this Court shall appear for, or represent, a party in any case except by permission of the Judge before whom the case is pending." While Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968) may restrict this Court's power to deny leave to appear, it does not weaken the requirement of Local Rule 6 that leave to appear be requested.

19. See In re Fletcher, 71 App.D.C. 108, 107 F.2d 666, cert. denied, 309 U.S. 664, 60 S.Ct. 593, 84 L.Ed. 1011 (1939).

litigation as a result of having made the Hurbrough loan.[20] The New York partner's appearance at the bankruptcy hearing subjected him and his firm to the lawful orders of this Court in this case.

■ And thirdly, the Court finds that by opposing Brown's motion to disqualify without advancing any jurisdictional defense, the New York firm has submitted to the jurisdiction of this Court. The New York partner, voluntarily insofar as the Court is concerned, has submitted a lengthy affidavit vigorously opposing the motion to disqualify. Moreover, he and his firm have without objection permitted the Houston partner and the Houston firm to represent them in the briefs and affidavits filed in response to Brown's motion. Thus even if their representation of Hutton here and at the bankruptcy hearing is insufficient to constitute the practice of law without leave, the New York attorneys have waived any right they may once have had to dispute the enforceability of an order of disqualification.[21]

■ As a fourth, independent basis for enforceability, the Court concludes that its interest in deciding all the issues raised by Brown's motion to disqualify is sufficiently great, and the New York firm's activities in Hutton's behalf are sufficiently numerous and significant to make an order of this Court disqualifying the New York attorneys from continuing to represent Hutton in connection with this case enforceable. Thus even if the firm's activities are considered too slight to constitute the practice of law within this District or an affirmative submission to the jurisdiction of this Court, due process permits this Court to decide the issues raised by the motion to disqualify.

Almost 150 years ago the Supreme Court recognized that the court before which an action is pending has a great interest in maintaining the ethical standards of the members of its bar.[22] This interest arises from the court's duty to supervise the conduct of the attorneys appearing before it and from its obligation to see that it and the legal system do not fall into disrepute.[23]

The Court concludes that the New York attorneys' failure to identify themselves as counsel for Hutton on its complaint or on its answer to Brown's motion to disqualify does not render these principles inapplicable. In his motion Brown alleges that the New York attorneys are advising Hutton and consulting with the Houston firm in connection with this litigation. Four factors induce the Court to credit this allegation. First, it is not denied in the New York partner's otherwise comprehensive affidavit. Secondly, the partner in his affidavit admits that his firm has remained available to consult and advise, and Hutton, by defending the motion to disqualify so vigorously, has manifested a desire to maintain that availability. Thirdly, the New York attorneys' desire, manifested in the New York partner's affidavit, to remain available to Hutton's Houston counsel as well as Hutton in connection with this case can only be for the purpose of continuing to advise Hutton and consult with its Houston counsel. And fourthly, when all of the papers filed by Hutton are compared and considered together, it is apparent that advice and consultation in this case between Hutton and its New York and Houston counsel have occurred.

If, as the Court has concluded, the New York attorneys are actively representing Hutton in connection with this

---

20. Within a reasonable time after Hutton shall have obtained substitute counsel, an order will be entered requiring the parties to show cause why this case should not be transferred to Judge Allen B. Hannay's docket for consolidation with the trustee's civil suit for damages or Hurbrough's suit against Hutton and others, or both, pursuant to the terms of Rule 42(a), F.R.Civ.P.

21. *Cf.* Rule 12(h), F.R.Civ.P.

22. Ex parte Burr, 9 Wheat. (22 U.S.) 529, 6 L.Ed. 152 (1824).

23. *See* Mattice v. Meyer, 353 F.2d 316, 319 (8th Cir. 1965).

litigation, they have become officers of this Court and will remain so for as long as this suit remains pending. This Court therefore has a great interest in supervising their conduct in connection with this litigation, as great an interest as if they had entered a formal appearance and were attending proceedings had in open court.

The second part of the weighing process is a finding that the absent party has engaged in conduct or knowingly caused consequences within the jurisdiction of the court. In this case the New York firm has done both. In this District the firm has conducted an extensive investigation of the Hurbrough loan transaction. Knowing that the events relevant to the Hurbrough matter transpired almost exclusively here, the firm has continued advising Hutton in connection therewith, both in Houston and in New York, for over two years. The partner appeared with Brown twice within this District, once before the Special Master in bankruptcy, an officer of this Court, and these appearances are the basis for Brown's motion. Finally, the firm's availability for consultation and its activity in opposition to Brown's motion can only have been intended to cause consequences here. The Court finds that together this conduct is more than enough to satisfy the requirements of due process.

■ Lastly, the Court is aware that before it can issue an order enforceable against the New York attorneys, it must afford them notice of the pendency of Brown's motion and an opportunity to be heard in opposition. These requirements, too, have been met. In his affidavit, the New York partner admits having actual knowledge of the pendency of the motion. Moreover, the affidavit and other papers filed by Hutton in opposition to the motion reflect a full consideration of the New York attorneys' rights and a complete presentation of their case.

■ The Court takes this occasion to refer again to the extraneous matter which appears in the affidavits filed by Hutton. All but one of its affiants are attorneys for Hutton and most of their affidavits are burdened by legal arguments, summations, and conclusions. Affidavits are vehicles for the presentation of facts to the Court, not legal arguments. They should be restricted to the statement of facts within the personal knowledge of the affiant. Argument of the facts and the law appropriately should appear in briefs. At best, legal arguments and summations in affidavits will be disregarded by the court.[24] In the Court of Appeals for the Fifth Circuit and other courts, such conduct by attorneys has drawn a sharp rebuke.[25] At the very least, the inclusion of such material in affidavits is a practice which courts should assiduously discourage.

Having determined that it has the power to grant the relief requested by Brown against both New York and Houston counsel, the Court may now turn to the merits of Brown's motion, and determine whether the relief he prays for should be granted.

## II. WHETHER COUNSEL REPRESENTED HUTTON ONLY

### A. Background

Within a month after trading in Westec stock was suspended, Hutton requested the New York firm to assist it in conducting an internal investigation of its Westec transactions. In September 1966, as part of this investigation, the New York associate was sent to Houston to gather information from Brown and other Hutton personnel. The associate questioned Brown at length on two occasions, exploring the factual background of a number of Hut-

24. United States v. Coleman Capital Corp., 295 F.Supp. 1016 (N.D.Ill.1969); Christophides v. Porco, 289 F.Supp. 403 (S.D.N.Y.1968).

25. See Inglett & Co. v. Everglades Fertilizer Co., 255 F.2d 342 (5th Cir. 1958); Universal Film Exch., Inc. v. Walter Reade, Inc., 37 F.R.D. 4 (S.D.N.Y.1965), and cases cited.

ton activities pertaining to Westec, including the Hurbrough loan. Upon his return to New York, he reported to the New York partner and then prepared a number of written reports for Hutton's New York management based on the detailed notes he had taken in Houston. Thereafter, both he and the partner conferred with Hutton's New York management.

Meanwhile, less than two weeks after the suspension of trading, Brown, who as Hutton's regional vice-president had been negotiating with Hurbrough, contacted the Houston firm to express Hutton's desire of obtaining additional collateral for the Hurbrough loan. While Brown continued his negotiations with Hurbrough directly, the Houston firm negotiated with Hurbrough's counsel. When negotiations broke down and Hurbrough filed suit, the Houston firm continued representing Hutton at Brown's request.

■■■■ Hutton's loan to Hurbrough was a "non-purpose" loan—one not made for the purpose of purchasing or carrying securities. Such loans are exempt from the margin requirements prescribed by the Federal Reserve Board.[26] Brown authorized and made the loan, which did not comply with the margin requirements, upon Hurbrough's representation that he intended to use the proceeds in his oil activities.

■■■ The Securities Exchange Act of 1934 imposes both criminal[27] and civil[28] liability upon any person who willfully extends credit in violation of the margin requirements or otherwise violates the Act. Section 21 of the Act authorizes the SEC to "make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of" the Act, to bring suits to enjoin acts or practices in violation of the Act, and to "transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under" the Act.[29] The SEC proceeding in which Brown testified was instituted under this authority. As a direct result of the SEC investigation, a federal grand jury indicted eight persons for violations of the securities acts and regulations.[30]

Under Chapter X of the Bankruptcy Act, the judge before whom a reorganization is pending may direct the trustee to "examine the directors and officers of the debtor and any other witnesses concerning" any matters relevant to the reorganization.[31] The SEC is permitted to intervene in the bankruptcy proceeding and participate in the trustee's investigation.[32] The Act directs the trustee to "report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and

---

26. The margin requirements applicable to brokers are found in part 220 of Title 12 of the Code of Federal Regulations, which has been promulgated by the Federal Reserve Board under the authority of §§ 7 and 23 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g, 78w (1964 & Supp. IV, 1968). Similar requirements, promulgated pursuant to the same authority, apply to banks and other lenders. See 12 C.F.R. pts. 207, 221.

27. See §§ 7, 23, and 32 of the Act, 15 U.S.C. §§ 78g, 78w, 78ff (1964 & Supp. IV, 1968).

28. See § 29 of the Act, 15 U.S.C. § 78cc (1964). This provision, of course, merely supplements the rule of tort law imposing liability on a person who causes damage by violating a statute.

29. See 15 U.S.C. § 78u(a), (e) (1964).

30. Four of the indictments were later dismissed. One of the defendants was tried and found guilty by a jury. Three pled guilty. These four were given prison sentences.

31. Section 167 of the Bankruptcy Act, 11 U.S.C. § 567 (1964).

32. Section 208 of the Bankruptcy Act, 11 U.S.C. § 608 (1964); In re Commonwealth Financial Corp., 408 F.2d 640 (3d Cir. 1969) (per curiam) ; SEC v. Krentzman, 397 F.2d 55 (5th Cir. 1968).

irregularities, and to any causes of action available to the estate".[33]

The bankruptcy hearing at which Brown testified was part of an investigation conducted by the Westec trustee, with the participation of the SEC, under the terms of Chapter X. The Trustee's report constitutes the complaint in a civil action brought by him against 93 defendants, including both Hutton and Brown.[34] Numerous other civil suits have also been filed, among them Hurbrough's suit against Hutton and several other defendants. The claims alleged by Hurbrough and the trustee against Hutton and Brown rest upon Brown's alleged knowledge at the time he authorized the Hurbrough loan that the loan proceeds were intended to be used to purchase the Westec shares which were the collateral.

It was in this setting that Brown was twice called to give testimony.

## B. The SEC Investigative Hearing

The formal SEC investigation into trading in Westec stock was commenced shortly after trading was suspended. Proceedings were conducted by an investigating officer of the SEC, who examined witnesses under oath. Pursuant to regulation, the hearings were non-public: only the witness, his attorney, and representatives of the Texas State Securities Board and the SEC were allowed in the hearing room.[35] Witnesses called by the investigating officer included the former officers and directors of Westec and parties to business transactions involving transfers of Westec stock.

Early in April 1967, the SEC requested Hutton to produce Brown to testify. Hutton so informed Brown. On the day before the hearing the New York partner and associate flew from New York to Houston. On arrival, they went directly to Brown's office. They and Brown discussed the Westec situation generally, and the Hurbrough loan transaction in particular. Brown was handed copies of the reports the associate had prepared for Hutton after his previous visits to Houston, and asked to study them. Both lawyers urged Brown to give responsive, truthful, and candid answers to all questions the SEC examiner might ask. In the course of the meeting, the partner informed Brown that he would accompany him to the hearing.

The next morning, both lawyers again met briefly with Brown, after which the partner accompanied him to the hearing. There the SEC's examining attorney informed Brown that the hearing was a non-public, formal investigative proceeding conducted jointly by the SEC and the Texas State Securities Board, and recited the SEC's statutory authority for the investigation. He then said

33. Section 167 of the Bankruptcy Act, 11 U.S.C. § 567 (1964).

34. Orville S. Carpenter, Trustee v. E. M. Hall, Jr., et al., Civil No. 68–H–738, S.D.Tex. (Hannay, J., presiding). See In re Westec Corp., supra note 3.

35. 17 C.F.R. §§ 203.5, .7(b)–(c) in part provide:
 § 203.5 Non-public formal investigative proceedings.
 Unless otherwise ordered by the Commission, all formal investigative proceedings shall be non-public.
 * * * * *
 § 203.7 Rights of witnesses.
 (a) * * *.
 (b) Any person * * * who appears * * * in person at a formal investigative proceeding may be accompanied, represented and advised by counsel * * *: Provided, however, That all witnesses shall be sequestered, and unless permitted in the discretion of the officer conducting the investigation no witness or the counsel accompanying any such witness shall be permitted to be present during the examination of any other witness called in such proceeding.
 (c) The right to be accompanied, represented and advised by counsel shall mean the right of a person testifying to have an attorney present with him during any formal investigative proceeding and to have this attorney (1) advise such person before, during and after the conclusion of such examination, (2) question such person briefly at the conclusion of the examination to clarify any of the answers such person has given, and (3) make summary notes during such examination solely for the use of such person.

to Brown, "I see you are accompanied by [the partner] here this morning. Is he your counsel in this proceeding?" Brown answered, "Yes."[36]

Brown's answer was unexpected, if affidavits filed by the New York partner and the associate are to be believed. In those affidavits, both the partner and the associate claim that during their conference the evening before the hearing, Brown was specifically informed of the New York firm's position as counsel only for Hutton. They also allege that Brown agreed to explain their firm's position to the examining officer if he was asked whether the partner represented him individually.

Brown submitted his supplemental affidavit to deny these allegations. Neither he nor Hutton, however, has offered to present testimony or any other evidence to assist the Court in resolving the conflict between his affidavit and those of counsel. For reasons which will appear, the Court has determined that the issue is one which may be left open.

Concluding the preliminary matters, the examining attorney advised Brown of his constitutional right to remain silent, explained that he lacked the power to grant any immunity from prosecution, and warned him of his criminal responsibility for perjury and false statements. The ensuing questioning focused primarily on the Hurbrough loan transaction, with particular reference to the scope of Brown's inquiry into the purpose of the loan, and Brown's knowledge of factual circumstances *which might have caused him to doubt the loan's non-purpose nature.* Near the end of the examination, the partner declined the opportunity to ask Brown questions, although he did make one statement for the record. During Brown's testimony, the partner observed, took notes, and at two points caused Brown to clarify his answers.

The official transcript of the SEC hearing states that the New York partner appeared as "Counsel for John D. Brown."[37]

## C. The Bankruptcy Hearing

Shortly after the suspension of trading, Westec experienced severe financial difficulties, and corporate reorganization proceedings were begun under Chapter X of the Bankruptcy Act.[38] Counsel for Westec's court-appointed trustee immediately began to investigate the affairs of the debtor, and soon instituted public hearings.[39] One of the transactions which came under his scrutiny was the Hurbrough loan. Aware that the Houston firm represented Hutton locally, counsel for the trustee approached the Houston partner in August 1967 and requested that Hutton produce Brown and two other Hutton employees for examination. This request was reported to Brown and to Hutton's New York office. The latter requested the New York partner to be present in Houston during the examinations. On the day before Brown was due to testify, the New York partner flew to Houston. On arrival, he met briefly with the Houston partner and Brown. The next morning, the New York partner and the Houston partner accompanied Brown to the hearing.

As soon as Brown had been sworn, the Special Master informed him that the SEC was participating, and warned him that the facts developed at the hearing could constitute violations of the securities laws. He then advised Brown of his right to counsel and of his privilege against self-incrimination, and stated that since he could not compel Brown to give incriminating testimony, all of Brown's answers would be deemed vol-

36. *See* note 4 *supra.*

37. *See* note 4 *supra.*

38. 11 U.S.C. §§ 501–676 (1964 & Supp. IV, 1968); *see* In re Westec Corp., *supra* note 3.

39. Such hearings are authorized by § 167 of the Bankruptcy Act, 11 U.S.C. § 567 (1964).

untary. After Brown had indicated that he understood these warnings, the following colloquy took place:

> The Master: "Do I understand correctly that you are represented by counsel of your choice here this morning?"
>
> The Witness: "Yes, sir."
>
> The Master: "Namely [the Houston partner] and [the New York partner]?"
>
> The Witness: "Correct."
>
> The Master: "Thank you, sir." [40]

After this exchange, and following a discussion among counsel concerning documents which counsel for the trustee had subpoenaed from Hutton, counsel for the trustee questioned Brown briefly about his background and experience in the securities field, and then conducted a searching examination with emphasis on the Hurbrough loan transaction.

At the conclusion of the hearing, the New York partner returned to New York and reported to Hutton there with respect to Brown's testimony. Subsequently, when the transcript of Brown's testimony became available, the partner furnished a copy to Hutton in New York. On the transcript, the official court reporter listed the Houston partner and the New York partner as having appeared "on behalf of the witness, John D. Brown".[41]

### D. Findings and Conclusions

Brown bases his motion to disqualify chiefly on undisputed record evidence. The official transcript of the SEC hearing reveals that the New York partner entered an appearance as counsel for Brown, not for Hutton. The official transcript of the bankruptcy hearing reveals that both the New York and Houston partners entered appearances for Brown, not for Hutton. At each hearing Brown identified counsel as his counsel, not as Hutton's, and counsel stood mute.

An attorney's appearance in a judicial or semi-judicial proceeding creates a presumption that an attorney-client relationship exists between the attorney and the person with whom he appears.[42] This presumption shifts to Hutton, the party denying the existence of the relationship, the burden of persuasion. When the relationship is also evidenced by the entry of a formal appearance by the attorney on behalf of the person with whom he appears, the presumption becomes almost irrebuttable, for the entry of a formal appearance has quite properly been called "record evidence of the highest character." [43] In this case the Court finds that Hutton's opposition has failed to overcome the presumption that the New York and Houston partners represented Brown when he testified in the SEC and bankruptcy investigations.

Hutton's briefs and affidavits collect and cite a great number of facts to show that counsel represented only Hutton at the SEC and bankruptcy hearings. Several merely evidence Hutton's longstanding relationship with the New York and Houston firms. These are inapposite, for Brown does not assert that counsel did not represent Hutton at the two hearings. His motion is based on the proposition that counsel represented him as well. Hutton and its counsel are in error if they believe that an attorney cannot ever represent two clients with respect to a single matter. Attorneys frequently represent more than one party

40. Transcript, *supra* note 3, at 5.

41. *Id.* at 2.

42. Bethlehem Steel Corp. v. United States Metal Plastics, Inc., 265 F.Supp. 535 (D.Md.1967), aff'd sub nom. Bethlehem Steel Corp. v. Devers, 389 F.2d 44 (4th Cir. 1968); Kaufman v. Wolfson, 137 F. Supp. 479 (S.D.N.Y.1956). *See generally* 7 Am.Jur.2d Attorneys at Law § 113 (1963); cases collected Annot., 88 A.L.R. 12, 15–16 (1934).

43. In re Newman, 172 App.Div. 173, 158 N.Y.S. 375, 379 (1916).

to a single transaction.[44] Ordinarily there is nothing improper in such a practice so long as the attorney discloses the consequences of the joint representation to all of his clients, and all parties as well as the attorney consent.[45]

 The remaining evidence marshaled by Hutton is also insufficient to overcome the presumption. Brown admits that he cannot recall ever conversing with either firm about representing him personally, or paying either firm a fee. But, the relation of attorney and client may be implied from the conduct of the parties. It is not dependent on the payment of a fee, nor upon the execution of a formal contract.[46] The Court takes judicial notice that it is not uncommon for corporate counsel to represent an individual corporate officer when he is sued as a result of actions he has taken within the ambit of his official duties.[47] When this occurs, corporate counsel becomes counsel for the individual officer as well, even if the corporation pays all of his fee. If the officer is a party to a proceeding, and corporate counsel appear on his behalf, an implied relationship between them arises.

Hutton asserts, however, that a relationship of attorney and client could not have been created by counsel's appearances with Brown, for at the time of the two hearings, Hutton's and Brown's interests were identical. And, since counsel's fiduciary duties to Hutton required that they be present on its behalf, and Brown was present only as Hutton's spokesman, this Court should not find that counsel represented Brown as well.

There are several fallacies in this reasoning. First, it is not accurate to say, as Hutton does, that the SEC and the Westec trustee were investigating only Hutton, and not Brown, who appeared solely as Hutton's spokesman. The SEC and the trustee were investigating a multitude of transactions in Westec stock and were examining in depth, the conduct of every person connected with or having knowledge of such transactions. Brown testified for himself as well as for Hutton. Secondly, Hutton's assertion that because Brown's interests at the two investigatory hearings coincided with Hutton's, he had no need for individual counsel at all, is without merit. It is true that if Brown's interests were the same as Hutton's, he had no need for independent counsel. But it is utterly illogical to argue that because Hutton had an urgent need for counsel, and Brown's interests were the same as Hutton's, Brown had no need whatsoever to be represented.[48] Yet this point is argued

44. *See* Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-Firm Conflicts of Interest, 73 Yale L.J. 1058, 1070–74 (1964).

45. *See, e. g.*, Texarkana College Bowl, Inc. v. Phillips, 408 S.W.2d 537 (Tex. Civ.App.—Texarkana 1966, no writ), and sources cited; ABA Canon 6 (identical to Texas Canon 6 and New York Canon 6); Calif.Bar Ass'n, Rule 7, reprinted following 3A West's Bus. & Prof.Code § 6076 (1962); Drinker 120–21; Note, *supra* note 44; *cf.* ABA Standing Committee on Professional Ethics, Informal Decision A–297, published in Drinker 299 and abstracted in Wise 154. The ethical considerations presented by this situation are extensively canvassed in the new CPR, in EC 5–14 to –20, and accompanying notes. (All references herein to the new CPR are to the Final Draft published July 1, 1969.)

46. *Cf.* Drinker 134. *See generally* 7 Am.Jur.2d Attorneys at Law § 91 (1963); 3 N.Y.Jur. Attorney and Client § 75 (1958); 7 Tex.Jur.2d Attorneys at Law § 29 (1959).

47. *See, e. g.*, Marco v. Dulles, 169 F.Supp. 622 (S.D.N.Y.), appeal dismissed, 268 F. 2d 192 (2d Cir. 1959); *cf.* the powers granted to corporations by state law, *e. g.*, Tex.Bus.Corp.Act Ann. art. 2.02, subd. A(16) (1956), V.A.T.S., to indemnify their officers and directors for costs incurred defending suits brought as a result of their official conduct or position. *Compare* Comment, The Attorney-Client Privilege in Shareholders' Suits, 69 Colum.L.Rev. 309, 317–19 (1969).

48. With its motion to reconsider, Hutton has submitted an affidavit of the Special Master at the bankruptcy hearing in which he stated: "It was my impres-

repeatedly in the papers in opposition to the motion.

Finally, it is unlikely that Brown's and Hutton's interests coincided precisely at the hearings.[49] This proposition is recognized in some of the pleadings and affidavits filed by Hutton in opposition. There it is argued that because of the fiduciary obligations which bound Brown to Hutton and required him to act loyally in its behalf, it would have been extremely improper for either the New York or Houston partner to have represented both Hutton and Brown in an investigation into the legality of the acts of Brown as agent for Hutton.

This brings the Court to Hutton's last cluster of arguments in opposition to Brown's motion, all of which are directed to the proposition that Brown could not have believed that corporate counsel were representing *him*. Hutton asserts that because it was Brown himself who asked the Houston firm to represent Hutton in its controversy with Hurbrough; because he had cooperated fully in the two firms' representation of Hutton; because the New York and Houston partners' appearances with him occurred solely as a result of their firms' obligations to Hutton; because his only contact with either firm occurred when he was functioning as an officer of Hutton and as a result of his position with Hutton; because at the hearings he was asked to testify only about acts he had done as an officer of Hutton; and, because before

the SEC hearing the New York partner and associate informed him that their firm represented only Hutton, he could not have thought that the attorneys who appeared with him were his.

In asking the Court to consider all the circumstances when determining whether Brown believed counsel to be his attorneys, Hutton has proposed a proper inquiry. Brown's reasonable understanding of his relation with the attorneys is the controlling factor here.[50] But when all circumstances are considered, it becomes clear that the transcripts of the two hearings reflect Brown's understanding of his relation with counsel accurately.

The formal SEC investigation had been convened to ascertain whether the securities laws or regulations had been violated. The SEC was authorized by statute to refer any information uncovered in its investigation to the Attorney General for his use in criminal prosecutions. When Brown was requested to appear, his conduct as an officer of Hutton had come under official scrutiny. Although Brown may not have known before the hearing that the focus of the inquiry would be on his approval of the Hurbrough loan, and particularly on his knowledge of its purpose, he was aware that the hearing was part of an SEC investigation into the trading in Westec stock. Brown and Hutton must have known, but if they did not actually know they were charged with knowledge

sion that [the New York and Houston partners] were appearing at the proceedings on behalf of Hutton." This statement, of course, is entirely consistent with the position of either party. Later in the affidavit, however, the master also stated: "The witnesses' individual rights and privileges were also protected as an incident to the attorneys' representation of Hutton." This statement merely confirms what the record shows, namely, that the New York and Houston partners represented both Brown (and the other Hutton personnel) and Hutton at the hearing.

49. *Cf.* Murphy v. Washington American League Base Ball Club, Inc., 116 U.S.

App.D.C. 362, 324 F.2d 394, 398 (1963); International Bhd. of Teamsters v. Hoffa, 242 F.Supp. 246, 255–256 (D.D.C. 1965) (suggesting that a latent conflict would always be present); Lewis v. Shaffer Stores Co., 218 F.Supp. 238 (S.D.N.Y.1963); Tex.Bar Ass'n, Professional Ethics Comm., opinion 252 (1962) [hereinafter cited as Texas Opinion xxx], reprinted in 26 Tex.B.J., Dec. 1963 Supp., at 174; Drinker 120. *Contra*, EC 5–18 and DR 5–105 of the new CPR.

50. *Cf.* 8 J. Wigmore, Evidence § 2302 (J. McNaughton rev. 1961); Drinker 134–35; Wise 168.

by virtue of the securities laws which regulated them in the conduct of their business, that if criminal violations were discovered in the course of Brown's examination, his freedom, but not Hutton's, would be in jeopardy; and additionally, that each could be fined. Since he, as well as Hutton, was in potential criminal jeopardy from what might be discovered from his testimony, both were entitled to and under the circumstances needed, the assistance of counsel.

Similarly, when Brown appeared at the bankruptcy hearing he knew that counsel for the trustee had been conducting a thorough investigation of transactions involving Westec stock, including the Hurbrough loan. He knew that the trustee's announced intention was to bring a civil action against all persons and companies suspected of violating securities laws and regulations in dealings with Westec stock. He knew that no criminal indictments had yet been returned. At the hearing he was told that the SEC was a party to the proceeding, although it was not conducting the investigation. Brown was told that any evidence developed at the hearing could be used against him. Most certainly, he knew that such evidence would be available to the trustee or any other person in a subsequent civil action and to the Department of Justice in criminal prosecutions if either should be brought.[51] When he appeared to testify, therefore, he faced potential civil liability as well as the possibility of criminal charges. Again he was entitled to and in need of counsel.

In this atmosphere it would seem reasonable and natural for Brown to have assumed that the New York partner represented him as well as Hutton when the partner accompanied him to the hearing before the SEC examiner; and, that the New York and Houston partners represented him as well as Hutton when they accompanied him to his examination by counsel for the Westec trustee. His prior contact with counsel, when he was acting only for Hutton, was not significant. When he was called by the trustee and the SEC to give testimony, he was subjected to the possibility of civil liability and criminal prosecution. These possible consequences—more severe in their potential impact upon him than upon Hutton—were acutely pressing.

The reasonableness of Brown's assumption is not destroyed by the coincidence that Hutton, for some of the same reasons as he, needed to be represented by counsel at the hearings. Hutton and Brown agree that at the time of the two hearings, both they and counsel believed their interests to be identical.[52] Certainly in these circumstances, Brown's awareness that counsel were representing Hutton could not have caused him to doubt that they were representing him as well.

The only other event urged by Hutton as establishing that Brown could not have understood counsel's appearances as appearances for him is the conversation alleged by the New York partner and associate to have occurred the evening before the SEC appearance. Counsel allege in their affidavits to have told Brown what to say the next day when he was asked if the attorney appearing with him was his attorney, and that Brown agreed to say that the attorney represented Hutton only. Brown, of course, denies that this discussion occurred.

In pondering this conflict in the affidavits, the Court has discovered that the record in this case provides many more questions than answers. If the conversation occurred as counsel allege, why did Brown not keep his promise when asked the expected question at the hearing? If so, why did the New York partner not cause Brown to clarify his answer, as he caused him to clarify other answers later in the examination? Why did the partner enter an appearance as counsel for Brown, not for Hutton? Why did he not speak to Brown after the hearing or take any steps to correct the transcript, if it was incorrect? Why did he again enter an appearance as counsel for Brown, not for

---

51. Cases cited note 32 *supra*.

52. *But see* note 80 *infra*.

Hutton, when Brown was called four months later to testify in the bankruptcy proceeding? Why did the Houston partner enter an appearance for Brown, not for Hutton, on the same occasion? Why did not the New York and Houston partners explain their firms' position with regard to representing Brown individually immediately before the bankruptcy hearing? Why did they not speak up when Brown described them as his attorneys, not as Hutton's? Why did they fail to correct the transcript of the bankruptcy hearing when it was received, if it was incorrect? Why did Hutton's New York management not correct the transcript on receipt, if it was incorrect? Why did Hutton and its counsel wait until after Brown's present counsel raised the issue—a year after the bankruptcy hearing and sixteen months after the alleged evening conversation—to deny that counsel had represented Brown at the SEC and bankruptcy hearings and to attack the accuracy of Brown's testimony?

If either party had requested an evidentiary hearing on the motion to disqualify, and Brown and the attorneys concerned had subjected themselves to cross-examination, the Court might have been led to a clear conclusion as to the answers to all of the above questions. But evaluating the record as it must without benefit of such cross-examination, the Court is impressed by the fact that after hearing Brown testify they were his counsel at the SEC hearing, New York counsel did not attempt to correct the record; and, that Brown gave the same answer as to his being represented by New York counsel when asked at the bankruptcy hearing four months later, although he had conferred further with the counsel after they had had a full opportunity to reflect on his testimony at the SEC hearing and to be certain that he not make the same mistake at the bankruptcy hearing, indeed if such a mistake had been made at the SEC hearing. Therefore, the Court is not

persuaded that Brown agreed with New York counsel at a conference held in Houston on the evening before his appearance at the SEC hearing, to testify that New York counsel represented Hutton only. The Court will assume arguendo but not find that the conference transpired precisely as New York counsel now contend; but nevertheless, the Court finds from Brown's reply given to the SEC examiner the day following the alleged conference and from his testimony before the Special Master in bankruptcy four months later, that Brown did not then appreciate the distinction between his individual and his representative capacity. He continued to believe that counsel would represent his interests, as well as Hutton's.

The Court thus finds that nothing advanced by Hutton has rebutted the presumption raised by counsel's appearances with Brown at the SEC and bankruptcy hearings. Nothing establishes that Brown believed or should have believed that the New York and Houston partners were appearing only for Hutton—in fact, the record has persuaded this Court to the contrary. Not until after Brown had moved to disqualify the New York and Houston partners and firms from continuing to represent Hutton in this case did Hutton or either partner attempt to disclaim the partners' appearances for Brown individually as they are revealed in Brown's statements at the hearings and in the official transcripts. Their belated disclaimers in opposition to Brown's motion to disqualify now come too late. An attorney may not wait to contradict the record until it is in the interest of himself or his client to do so.[53]

The New York partner represented Brown in his individual capacity when he appeared and testified in the SEC investigative proceeding. Both the New York partner and the Houston partner represented Brown in his individual

53. *Cf.* Cord v. Smith, 338 F.2d 516, 523 (9th Cir. 1964); In re Newman, 172 App.Div. 173, 158 N.Y.S. 375, 379–380 (1916).

**392**

capacity when he appeared and testified at the bankruptcy hearing before the Special Master.

### III. WHETHER COUNSEL SHOULD BE DISQUALIFIED

Assuming *arguendo* that the New York and Houston partners represented Brown individually at the SEC and bankruptcy hearings, Hutton advances three legal arguments against disqualification: (1) Brown is not entitled to move for disqualification because he communicated no information to counsel which was confidential as to Hutton. (2) An order of disqualification in this case would have a distinctly adverse effect on the corporate bar without serving any interest of Brown's, and would therefore violate public policy. (3) Brown has waived whatever right he may once have had to move for disqualification. These contentions may now be considered.

### A. The Claimed Absence of Confidentiality

In their affidavits the New York partner and associate assert that each time they conferred with Brown they told him that they would report the substance of their conversation to Hutton management in New York, and that Brown did not object. Brown does not dispute this, nor does he deny Hutton's assertion that as a matter of law, everything he knew about the Hurbrough loan transaction was already known to Hutton by virtue of its being known to him within the scope of his duties as an officer of Hutton. Brown thus does not rest his motion to disqualify on an allegation that counsel's current representation of Hutton violates their duty to preserve the confidentiality of information they obtained from him as his attorneys. Hutton asserts that this omission is fatal, and that a prerequisite to disqualification is a showing that the former client shared confidential information with his erstwhile attorney.

In support of this proposition, Hutton has cited a large number of cases. All are distinguishable. In most, the courts found a sufficient likelihood that the client had disclosed confidences, and held that disqualification was necessary to protect the former client's confidences.[54] None of these cases presented the responsive issue urged by Brown, that the sharing of secrets is not a prerequisite to disqualification.[55]

Courts in five other cases cited by Hutton found that the moving party had never been a client of the attorney sought to be disqualified, in a matter related to the subject of the pending litigation.[56] Again, the response urged by Brown was not presented.

Several other cases were concerned with the scope of the attorney-client evidentiary privilege, not with a former

---

54. *E. g.*, United States v. Trafficante, 328 F.2d 117 (5th Cir. 1964); Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp., 216 F.2d 920, 52 A.L.R.2d 1231 (2d Cir. 1954); T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265 (S.D.N.Y.1953); People v. Gerold, 265 Ill. 448, 107 N.E. 165, 177 (1914).

55. An attorney's ethical duty not to disclose his client's confidences, *see, e. g.*, ABA Canon 37; Texas Canon 34; Canon 4 and DR 4–101 of the new CPR, requires that he withdraw (or be disqualified) if continuing his employment might cause him to reveal or use the confidences of a former client. *See* authorities cited *supra* in this and the preceding note. Thus where the receipt of confidential information can be proved, the party moving for disqualification does not need to urge the broader rule against representing conflicting interests.

56. Meehan v. Hopps, 144 Cal.App.2d 284, 301 P.2d 10 (1956); Almon v. American Carloading Corp., 312 Ill.App. 225, 38 N.E.2d 362 (1941), rev'd on other grounds, 380 Ill. 524, 44 N.E.2d 592 (1942); Fanchon & Marco, Inc. v. Leahy, 351 Mo. 428, 173 S.W.2d 417 (Mo.1943); Bent v. Priest, 10 Mo.App. 543 (1881), aff'd, 86 Mo. 475 (1885); Ferguson v. Alexander, 122 S.W.2d 1079 (Tex.Civ. App.—Dallas 1939, writ dism'd jdgmt. cor.).

client's right to move for disqualification.[57] These cases, too, are inapposite.

In cases of this last type, neither former client is permitted to invoke the attorney-client privilege against the other, although either may invoke it against third parties. The courts reason that information imparted to the common attorney relating to the subject of the joint representation is imparted for the mutual benefit of all the joint clients and is therefore not privileged against any of them. This Court is aware of only one case involving a motion to disqualify in which this reasoning has been applied to deny the motion. In Croce v. Superior Court,[58] an intermediate appellate court in California extended the rule developed in the evidentiary privilege cases, holding that whenever an attorney would not be disqualified from testifying over the objection of a former client, he should not be disqualified from appearing against him. Hutton cites this decision in opposition to Brown's motion.

■ The rule of *Croce* has not been followed in any other state and several more recent cases suggest that its rule may no longer be followed in California.[59] But whatever the rule may be in California, *Croce* is not persuasive authority here. In *Croce*, the party moving to disqualify asserted as his sole basis for dis-

57. United States v. Tellier, 255 F.2d 441, 447 (2d Cir.), cert. denied, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958); Wilcoxon v. United States, 231 F.2d 384 (10th Cir.), cert. denied, 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469 (1956); Chitty v. State Farm Mut. Ins. Co., 36 F.R.D. 37 (E.D.S.C.1964); City of Philadelphia v. Westinghouse Elect. Corp., 210 F.Supp. 483, 484 (E.D.Pa.1962); Minor v. Bishop, 180 S.W. 909 (Tex.Civ. App.—Texarkana 1915, no writ).

58. 21 Cal.App.2d 18, 68 P.2d 369 (1937).

59. *See* Big Bear Municipal Water Dist. v. Superior Court, 269 Cal.App.2d 1035, 75 Cal.Rptr. 580 (1969); Earl Scheib, Inc. v. Superior Court, 253 Cal.App.2d 703, 61 Cal.Rptr. 386 (1967); Jacuzzi v. Jacuzzi Bros., Inc., 218 Cal.App.2d 24, 32 Cal.Rptr. 188 (1963). *Croce* and the California cases consistent with it e. g., Arden v. State Bar, 52 Cal.2d 310, 341 P.2d 6, 11 (1959) (per curiam, en banc); Hillman v. Stults, 263 Cal.App. 2d 848, 879, 70 Cal.Rptr. 295, 314 (1968), cite and quote Rules 5 and 7 of the California State Bar, which provide:

[Rule 5] A member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client · or former client.

[Rule 7] A member of the State Bar shall not represent conflicting interests, except with the consent of all parties concerned.

Rules 5 and 7 thus seem to prohibit the subsequent representation of an adverse interest if confidential information has been disclosed, and the concurrent representation of opposing interests without full consent, but not the subsequent representation of an interest adverse to a client who disclosed no confidential information to his former attorney. California has adopted no disciplinary rule expressly codifying the principle urged by Brown here, although Rule 7, *supra*, and Bus. & Prof. Code § 6068(e) (1962) ("It is the duty of an attorney: * * * (e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client") could be construed as imposing a dual duty on attorneys. *Croce* and the cases consistent with it do not refer to § 6068(e); instead, those courts have construed Rules 5 and 7 as containing a negative pregnant, permitting the subsequent representation of an interest conflicting with the interest of a former client where no confidential information was disclosed by the former client. The opinions in the three cases leaning the other way (*Big Bear, Earl Scheib* and *Jacuzzi*) contain language consistent with Wise's statement of the broad rule urged by Brown here:

The basis of determination * * * is, of course, the application of the law governing fiduciaries * * *. The gravamen of the test is not the disclosure of confidences but whether a breach of a fiduciary obligation is involved.

Wise 141. *See also id.* at 169. Since this Court is not bound by California law, *cf.* Cord v. Smith, 338 F.2d 516, 524 (9th Cir. 1964), and is of opinion that the broad rule is the proper one, no attempt will be made here to guess the present state of the California law.

qualification, that he had disclosed confidential information to his attorney. The court held that the information imparted was not confidential, and denied the motion. The reason urged by the moving party in support of disqualification was thus held insufficient. The opinion does not indicate that the moving party advanced the proposition urged by Brown here, that an attorney may be disqualified even if no confidential information was disclosed.

 What the court in *Croce* failed to note is that the basis for the rule against representing conflicting interests is broader than the basis for the attorney-client evidentiary privilege. The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys,[60] and both protect only the confidential information disclosed.[61] The duty not to represent conflicting interests, on the other hand, is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them. The privilege is bottomed only on the first of these attributes, the conflicting-interests rule, on both.[62]

The dual basis for the rule against representing conflicting interests is implicit in its statement as formulated in Canon 6 of the American Bar Association's Canons of Ethics:

> The obligation to represent the client with undivided fidelity and not to divulge his secrets or *confidences* forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which *confidence* has been reposed. (Emphasis added.)[63]

This canon has recently been construed not to require proof of the acquisition, use, or misuse of confidential information as a condition for disqualification.[64] The court held that a person seeking to disqualify his former counsel from continuing to appear against him need show only (1) the former representation, (2) a substantial relation between the subject matter of the former representation and the issues in the later lawsuit, and (3) the later adverse representation.

The case just cited, although relied on heavily by Brown, is—like each of those cited by Hutton—distinguishable. Not only was the court able to infer the disclosure of confidential information, but the case involved a subsequent retainer, not the continuation of a retainer in behalf of one of two formerly joint clients.

The thorough briefing of both parties and the Court's extensive independent research in this matter have failed to unearth any reported decision squarely presenting the issue to be decided here: Whether the attorney for two formerly joint clients should be disqualified from appearing in litigation between them over a matter which was the subject of the former representation.[65] On this issue,

60. *See generally* EC 5–14 and accompanying notes, in the new CPR.

61. *Cf.* ABA Canon 37; DR 4–101 of the new CPR.

62. *See* Drinker 104; Wise 141; Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L.J. 917, 923 n. 35 (1955).

63. The new CPR fails to make this distinction so graphically, although the notes to DR 5–105(A) suggest that the committee had subsequent as well as concurrent representations in mind.

64. Cord v. Smith, 338 F.2d 516, 524–525 (9th Cir. 1964); *cf.* United States v. Trafficante, 328 F.2d 117, 120 (5th Cir. 1964).

65. In re Aqua Hotel Corp., 251 F.2d 138 (9th Cir. 1957), cert. denied, 356 U.S. 965, 78 S.Ct. 1005, 2 L.Ed.2d 1072 (1958) may be the single case which most nearly approaches being in point. The court's decision there may be read, however, as a finding that the moving

this case appears to be one of first impression.[66]

■ For the reasons stated, none of the relevant cases offers much guidance here. Nevertheless, in determining to grant Brown's motion to disqualify, the Court finds itself persuaded by two considerations suggested in some of the reported decisions. First, the ethical standards for attorneys must be formulated and construed in that way which will best protect the interests of clients and uphold the dignity of the legal profession.[67] A strict construction of a lawyer's duties in cases like this one would give clients cause to feel they had been mistreated. If an attorney is permitted to defend a motion to disqualify by showing that he received no confidential information from his former client, the client, a layman who has reposed confidence and trust in his attorney, will feel that the attorney

has escaped on a technicality. If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself—a relationship which must be one of trust and reliance—they can only undermine the public's confidence in the legal system as a means for adjudicating disputes.[68] The position urged by Hutton, if adopted, could only dilute the quality of justice.

The second consideration which has persuaded this Court concerns the difficulties involved in determining whether confidential information has been disclosed to the former attorney.[69] The responsibility for making necessary decisions cannot be shirked, but courts have a duty to avoid making needless distinctions. Upon careful consideration, this Court has reached the conclusion that the receipt of confidential information is not a prerequisite to disqualification.[70]

party had failed to establish that she was a former client of the attorney she sought to have disqualified. The case apparently also involved a subsequent retainer. See id. at 141. Austin Theatre, Inc. v. Warner Bros. Pictures, Inc., 224 F.2d 824 (2d Cir. 1955), cert. denied, Paramount Film Distributing Corp. v. Austin Theatre, 350 U.S. 932, 76 S.Ct. 304, 100 L.Ed. 814 (1956) is also distinguishable. There the attorney sought to be disqualified was the ex-partner of an attorney who had received confidences from the parties moving for disqualification. For a suggestion that a more lenient rule is proper in such cases, see Note, *supra* note 44. *See also* note 70 *infra*.

66. The writers, however, agree that on facts such as those here, the attorney should be disqualified. Drinker 112; Wise 155. *See also* Texas Opinion 288, reprinted in 27 Tex.B.J., Sept. 1964 Supp., at 207.

67. *Accord,* United States v. Trafficante, 328 F.2d 117 (5th Cir. 1964); EC 5–15 of the new CPR.

68. *Accord,* Wise 142; Drinker 115, quoting an opinion of the Ethics Committee of the New York County Bar Association:

The matter is not to be determined by such facts as, that the original services were rendered on the employment of another lawyer, or that the services may have had no particular bearing up-

on the phase of the litigation contemplated to be conducted in behalf of the new employer, or that it is probable that no information was acquired in the first employment that might prove useful in the subsequent employment. Irrespective of any actual detriment, the first client might naturally feel that he had in some way been wronged when confronted by a final decree obtained by a lawyer employed in his behalf in an earlier part of the same litigation. To maintain public confidence in the Bar it is necessary not only to avoid actual wrong doing but an appearance of wrong doing.

69. *See, e. g.,* Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp., 216 F.2d 920, 925 (2d Cir. 1954); T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265, 268–269 (S.D.N.Y.1953).

70. The author of the Note, *supra* note 44, argues that the rule disqualifying all members of a large law firm whenever one member of the firm has become privy to confidential information is too broad. The rule stated in the text of this memorandum opinion, as applied to the members and associates of the New York and Houston firms other than the New York and Houston partners, is even broader, for it dispenses with the need to show that any confidential information was disclosed to anyone. Hutton, however,

### 396

### B. The Claimed Violation of Public Policy

■■ In an impassioned and emotional appeal to the Court's conscience, Hutton urges, both in response to the motion to disqualify and in support of its motion to reconsider, that to disqualify corporate counsel, under circumstances such as those here, would be contrary to public policy. Hutton argues that disqualification here would have a distinctly adverse effect upon those members of the bar who regularly represent corporations, and that to prohibit corporate counsel who appear with a corporate officer called to testify in a hearing about his official conduct from thereafter participating in any legal action against that officer would be unjust and inequitable. Hutton further asserts in this context that Brown's motion rests upon a "hollow technicality" and that an order of disqualification on these facts would be unjust, inequitable and oppressive.

In the first place, as will be seen, these contentions evidence a misunderstanding of and therefore misstate, the effect of an order of disqualification. But more importantly, by advancing this argument, counsel for Hutton indicate a failure to appreciate the duty of a lawyer to exercise an independent professional judgment on behalf of each person he represents.

The presence of counsel is essential when a corporate officer, like Brown here, is called to testify before an investigative body. The possibility that federal or state statutes or regulations have been violated, or that the officer has breached his fiduciary obligations to his corporate employer, is always present in this day of frequent stockholder suits and burgeoning securities law. The New York firm as general counsel for Hutton apparently has long recognized this need, for its policy has been to dispatch an attorney whenever a Hutton officer has been requested to appear. What neither counsel for Hutton has accepted, however, is the fact that the corporate officer who is called to appear has at least an equal, and probably a greater need than the corporation for competent legal advice.[71] Many statutes and regulations governing corporate affairs impose criminal sanctions for violations. Although either the corporation or the officer can be fined, only the officer can be imprisoned.

In this case the Court has found that Brown believed that he, not just Hutton, was the client of counsel and that this created an attorney-client relationship. Once this had occurred, counsel became obligated to exercise an independent professional judgment on behalf of each of their clients, Brown and Hutton.[72] This duty could have been discharged in either of two manners. First, counsel might have elected to make themselves available to represent both Brown and Hutton. Had they done so, their duty to both of their potential clients would have required them to inform each fully. The extent of disclosure necessary would be governed by the reason for requiring counsel to disclose: to enable each potential client to make a reasoned choice. In the context of the two investigatory hearings at which Brown testified, full disclosure would have required counsel

has not attempted to distinguish the New York and Houston partners from the other members and associates of the New York and Houston firms in its opposition to Brown's motion to disqualify. The question whether an attorney's disqualification necessarily requires that all members and associates of his firm be disqualified as well may therefore be left open here.

71. *See also* Comment, *supra* note 47, at 317–19, in which the author suggests that as a practical matter corporate counsel normally represent management rather than the corporation or its shareholders. *Cf.* Marco v. Dulles, 169 F. Supp. 622, 628–630 (S.D.N.Y.), appeal dism'd, 268 F.2d 192 (2d Cir. 1959).

72. *See* J. W. Hill & Sons, Inc. v. Wilson, 399 S.W.2d 152 (Tex.Civ.App.—San Antonio 1966, writ ref'd n. r. e.); ABA Canon 15, *quoted in* International Bhd. of Teamsters v. Hoffa, 242 F.Supp. 246, 257 n. 65 (D.D.C.1965); Canon 5 of the new CPR.

to apprise each potential client of the existence of any potential conflict, to advise each of the consequences of a joint representation, to explain to each the serious consequences which could occur to either or both as a result of Brown's testimony at the hearings, and to inform each that either was free to retain independent counsel.[73] Only then would either Hutton or Brown have been in a position to make a knowing waiver of its or his right to retain independent counsel.

Counsel's second option was to inform Brown that when they appeared at the hearings, they would do so solely on Hutton's behalf, and that if Brown had any interest which failed to coincide with some interest of Hutton's his interest would go unprotected unless he employed personal counsel.[74] By so advising Brown, they would have prevented an attorney-client relationship between themselves and him from arising.

Instead counsel made themselves available to Brown as well as to Hutton, failed to make an adequate disclosure, at least to Brown,[75] and held themselves out at the SEC and bankruptcy hearings as representing both Hutton and Brown.[76]

The rule against representing conflicting interests disqualifies an attorney from appearing adversely to his former client in litigation growing out of the subject matter of the prior representation. The Court has held that the former client's failure to disclose confidential information to his attorney does not disable him from moving to disqualify. Since Hutton concedes that this litigation has grown, at least in part, out of the matters Brown testified about at the SEC and bankruptcy hearings, the rule permits the Court to grant his motion to disqualify. Hutton argues, however, that in view of counsel's good-faith indiscretion and the financial burden which will fall on Hutton if counsel are required

73. *See* Guardian Abstract & Title Co. v. San Antonio Bar Ass'n, 278 S.W.2d 613, 621 (Tex.Civ.App.—Austin 1955), rev'd on other grounds, 156 Tex. 7, 291 S.W.2d 697 (Tex.1956) ; ABA Canon 6; EC 5–16 and DR 5–105(C) of the new CPR ; Drinker 120–21.

74. One commentator has suggested that in a situation like the one in this case, the attorney and both clients may agree that his representation of one (in this case, Brown) will be subordinate to his representation of the other (in this case, Hutton). Wise 156. Yet even he disapproves of such an arrangement, *see id.*, and nothing in the ABA canons or in the new CPR would permit it. *See also* Drinker 112 ("When the interests of clients diverge and become antagonistic, their lawyer must be absolutely impartial between them * * * ") ; authorities cited note 72 *supra*. No such arrangement was attempted here, however, so its propriety is not before this Court.

75. The record does not disclose whether or not counsel made any of the necessary disclosures to Hutton. The alleged conversation and agreement the night before the SEC hearing, *see* text following note 36 *supra*, may have been an attempt by counsel to fulfill their ethical obligations to Brown. However, Brown's state-

ments at the hearings, accorded their minimum import, demonstrate that he did not appreciate the distinction between his individual and his representative capacities, and counsel never again attempted to disabuse him of his misunderstanding. Because he failed to grasp counsel's distinction, their explanation, if it in fact occurred before the SEC hearing, was inadequate.

76. In an affidavit attached to the motion to disqualify, counsel for the Westec trustee stated:

At those proceedings, on the 30th day of August, 1967, [the New York and Houston partners] appeared as attorneys on behalf of E. F. Hutton & Company Inc., John D. Brown, and [another Hutton employee] * * *. At all times prior to Mr. Brown's testimony given on that date, and in my conversations with [the Houston partner] immediately afterwards, I was given the distinct impression that [the Houston partner] was acting as Mr. Brown's attorney, at least insofar as the matters under investigation by the Trustee were concerned.

This statement corrborates the testimony of Brown, the appearances of counsel, the conduct of counsel, and the circumstances referred to in Part II of this memorandum opinion.

to withdraw and cease advising Hutton in connection with this litigation, the general rule should be held inapplicable.

In thus appealing to the Court's conscience, Hutton is asking the Court to weigh the interests which would be furthered by disqualification against its financial interest in avoiding the expense of retaining substitute counsel. If this is done, Hutton's interest must be found meager.

The interests which would be promoted by disqualification have been canvassed in the Court's discussion of confidentiality. Disqualification vindicates the former client's trust in and reliance on his attorney. It promotes the use of the legal system for the adjudication of disputes by upholding the dignity of the legal profession. And in cases like this one, if it encourages counsel to make the disclosures which the New York and Houston partner omitted before the two investigatory hearings here, it will help ensure that corporate officers in their individual capacity, and not just corporations, will be adequately represented by independent counsel. Against these interests the cost to Hutton is insufficient to persuade this Court to deny Brown's motion.

The Court emphasizes that not all corporate counsel appearing with corporate officers who are called to testify will risk disqualification. Only those counsel who permit the officer to believe that they represent him individually will disable themselves from appearing in subsequent litigation against him. And it is eminently proper to disqualify these, for they are the persons who are in a position, and have the obligation, to ensure that there is no misunderstanding by the officer.

Hutton has argued, opposing disqualification, that Brown was deceitful in failing to disclose the potential conflict between himself and Hutton to his corporate attorney. In dismissing this contention, the Court finds it unnecessary to decide whether Brown, a layman, was aware of any potential conflict at the time of the hearings at which he was examined.[77] The rule against representing conflicting interests must of necessity be a rule of general application, for the protection of the ignorant as well as the sophisticated. And the rule requires counsel—not clients—to search out and disclose potential conflicts between clients and the facts which cause them to arise.

The obligation to search out and disclose potential conflicts is placed on the attorney in order to put the client in a position to protect himself by retaining substitute counsel if he so desires.[78] The client's duty goes no farther than to disclose the facts to counsel,[79] and there is nothing in the record before this Court to indicate that Brown did not disclose the facts to Hutton's counsel. Once apprised of the facts, counsel incur the responsibility of applying the law to the facts and advising their clients of any legal ramifications. While every man is presumed to know the law, the law does not presume each man a lawyer. Men who retain counsel are entitled to look there for representation. Counsel cannot be heard to say that their client failed to represent them.

The Court notes, additionally, that the record in this case clearly implies that Hutton and its New York counsel were aware of a latent conflict between Brown and Hutton even before Brown appeared to testify at the SEC hearing. In their affidavits the New York partner and

---

77. In fact, it is undisputed that at the two hearings, as well as in the earlier conference with the New York associate and at all times subsequently, Brown has always maintained that he was unaware of any fact which could taint the loan transaction. It is only Hutton—and Hurbrough—who suggest the contrary.

78. Lysick v. Walcom, 258 Cal.App.2d 136, 65 Cal.Rptr. 406, 414 (1968); see ABA Standing Committee on Professional Ethics, Opinion 160 (1936); EC 5-16 of the new CPR; Drinker 121; Wise 156.

79. Cf. ABA Canon 8.

associate state that within a month after the suspension of trading, Brown had disclosed substantially all of his version of the Hurbrough loan transaction. The New York partner also states that no facts were developed at the SEC hearing which had not already been uncovered by the New York firm in its investigation for Hutton. If the existence of a potential conflict is apparent from Brown's testimony at the SEC hearing, and the Court believes it is, it is quite unlikely that the conflict was not also apparent from the facts given by Brown to the New York associate and the reports prepared by the associate almost seven months before.[80]

Hutton also suggests that a rule requiring disclosure would undermine the relation between a corporation and its officer. This seems unlikely. If a potential conflict exists and is serious enough to cause the officer to retain independent counsel, his time with the corporation is probably limited. Keeping him in the dark with respect to the conflict is unlikely to lengthen his service much.

In the instant case, Brown appeared at two hearings accompanied by Hutton counsel, from all appearances confident that counsel were indeed his lawyers, and not just Hutton's. At each hearing he was asked if the counsel present appeared for him. At each hearing counsel remained silent when he replied that they did. To permit them now to deny it would be improper. Their appearance now against him can only appear unseemly, regardless of the amount of representation they afforded him, or the secrecy of their discussions and advice to him at the time. In a similar case the Court of Appeals for the Fifth Circuit put counsel's present obligation succinctly:

> The Preamble to the Canons of Ethics admonishes the members of the bar that their conduct should be such as to merit the approval of all good men. That conduct should not be weighed with hair-splitting nicety. We have found no exceptions to the exhortation to "abstain from all appearance of evil." 1 Thessalonians 5:22.[81]

Public policy thus is the reverse of Hutton's argument. It is a buttress, not a limit, for the rule against conflicting interests.

---

80. Even if the latent conflict between Brown and Hutton was not apparent from Brown's original story as given to the New York associate or from his testimony in the SEC proceeding, it is inconceivable that counsel had not discovered it prior to Brown's appearance in the bankruptcy investigation. Late in July 1967, Hurbrough filed suit against Hutton and others, claiming that Hutton knowingly violated the securities laws in making the loan, and that this knowing violation voided the loan agreement. Early in August, counsel for the Westec trustee began examining Hurbrough and several others who had been involved in the loan transaction. Hutton's New York office requested the Houston partner to attend these hearings on Hutton's behalf and to forward copies of the transcripts of proceedings to the New York firm. On the day of the first hearing he attended, counsel for the trustee approached him about producing Brown to testify. He cannot have ignored this coincidence.

Neither party has made copies of the transcripts of the early August hearings a part of the record of this case, but the transcript of Brown's testimony, submitted by both parties, reveals that Hurbrough testified he "explained the exact situation to [Brown]" before Brown authorized the loan. Transcript, *supra* note 3, at 55. If Brown authorized the loan with such knowledge, he committed a criminal violation of the Securities Exchange Act. This alleged criminal violation is one basis for Hutton's present suit against Brown. Yet later that month the Houston and New York partners attended the trustee's investigation with Brown, entered an appearance for him individually, and allowed him to identify them as his counsel.

81. United States v. Trafficante, 328 F.2d 117, 120 (5th Cir. 1964). Canon 9 of the new CPR expresses the identical ideal: "A lawyer should avoid even the appearance of professional impropriety." *See also* Wise vii ("If it is a question of ethics, the answer is 'no.'").

## C. The Claimed Waiver

Hutton's last argument against Brown's motion to disqualify is waiver. Hutton contends that since Brown consented to the dual representation at the time of the hearings, he has waived his right to separate representation at the hearings, and cannot now object to counsel's continued representation of Hutton here. This contention is utterly without merit. It is yet another attempt to shift to the client a professional obligation imposed on counsel for the client's protection.

It is not disputed that Brown consented to the dual representation when he appeared at the hearings. There is not a scintilla of evidence before the Court, however, that Brown, a layman, either understood or appreciated the potential conflict between himself and Hutton. The only evidence in the record is opposed.[82] Likewise, there is no evidence before the Court that Brown at a later date consented to counsel's current adverse representation or waived his right to object.

As heretofore indicated, it was the duty of counsel to call to the attention of both Hutton and Brown the existence and legal implications of any potential conflict of interest. Receipt of such advice would be the bare minimum predicate for a waiver by Brown of his right to object to a subsequent adverse representation. A person cannot waive a right of which he is unaware, since ordinarily a waiver must be intentional. See Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Whether receipt of such advice, followed by a consent by Brown, would be sufficient to show a waiver is not before the Court, for no advice was ever given.[83] Absent such advice, however, there can have been no waiver.

It should be made clear that the Court does not question the professional integrity or good faith of counsel. The most that could be found in the record of this case is a serious error of professional judgment. However, when a conflict of interest is found, good faith is irrelevant.[84] The conflict alone is sufficient to require disqualification.

## IV. THE INJUNCTIVE RELIEF

In addition to disqualification, Brown has requested that the Houston and New York firms be enjoined from making available to Hutton or other counsel any part of their files which contains information about the Hurbrough loan transaction which came from Brown. This relief will be denied.

Brown gave information to counsel concerning the Hurbrough loan transaction long before counsel appeared with him at the SEC and bankruptcy hearings. As a corporate officer, Brown's duty to his corporate employer required him to furnish this information to counsel at Hutton's request. In fact, because Brown obtained his knowledge within the scope of his position as an officer of Hutton, the information which he conveyed to counsel was, as a matter of law, already known to Hutton.[85] The attorney-client privilege is therefore not available to Brown against Hutton, since all infor-

---

82. See note 77 supra.

83. See Fleischer v. A.A.P., Inc., 163 F. Supp. 548, 559 (S.D.N.Y.1958) appeal dismissed sub nom. Fleischer v. Phillips, 264 F.2d 515 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); Lysick v. Walcom, 258 Cal.App. 2d 136, 65 Cal.Rptr. 406 (1968); cf. International Bhd. of Teamsters v. Hoffa, 242 F.Supp. 246, 257 (D.D.C.1965).

84. E. g., Chugach Elec. Ass'n v. United States Dist. Court, 370 F.2d 441 (9th Cir. 1966), cert. denied, 389 U.S. 820,

88 S.Ct. 40, 19 L.Ed.2d 71 (1967); T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265, 271 (S.D.N.Y. 1953); Cochran v. Cochran, 333 S.W. 2d 635, 639 (Tex.Civ.App.—Houston 1960, writ ref'd n. r. e.); cases cited 3 N.Y. Jur. Attorney and Client § 75 (1958); cf. Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank, 408 F.2d 1099 (8th Cir. 1969).

85. Brown conceded this. See generally 19 C.J.S. Corporations § 1078 (1940).

mation he gave to counsel already was known to Hutton, and since Brown gave the information to counsel knowing that counsel, in turn, would convey it to Hutton's New York management. Accordingly, his request for injunctive relief is denied.

## V. CONCLUSION AND RELIEF

■ The authorities and ethical principles heretofore discussed impose a clear duty on the Court to require present counsel for Hutton to withdraw. In the past, both the New York and Houston firms have represented Brown when he was examined with reference to his understanding of the Hurbrough loan transaction. Their current appearance here in opposition, in a lawsuit which may turn in substantial part on his understanding of that transaction, is improper. As they have declined to withdraw voluntarily, the Court must direct them to terminate their representation of Hutton in this case and to refrain from aiding, consulting or advising new counsel retained by Hutton, except to the limited extent reasonably necessary to the transfer of their duties to new counsel.

As the Court is of the opinion that the relief prayed for by Brown should be denied but that relief of the kind and to the extent above specified should be granted, counsel for Brown is requested (a) to frame an order consistent with the views expressed in this memorandum opinion, (b) to attach such order to an appropriate motion for judgment and file

same within 30 days, and (c) to notice such motion to plaintiff.

To the extent that it may be in conflict therewith, this memorandum opinion supersedes all other orders and findings previously announced by the Court, either orally or in writing.[86]

All facts set out in this memorandum opinion, to the extent that they may be relevant to the motions discussed herein, are hereby found to be facts for the purposes of those motions. This finding, however, is not intended to be, and is not a finding of any fact concerning the merits of this cause, nor a finding of any fact with reference to any other motion of the parties now pending. The above similarly constitutes conclusions of law with respect to the motions discussed herein, to the extent it may be relevant to their disposition.

The Clerk will file this memorandum opinion and send a copy to counsel for each party.

## SUPPLEMENTAL MEMORANDUM

This Memorandum supplements and amends the Memorandum Opinion entered by this Court on September 18, 1969. Therein, the Court explained why it believes that counsel for plaintiff should be disqualified, but left open the question of the appealability of an order of disqualification. Briefs have now been submitted on this question, and the issue is ripe.

"The general principle of federal appellate jurisdiction, derived from the common law and enacted by the First Congress, requires that review of nisi

---

86. When the Court announced its decision on the motion to disqualify, it indicated, in response to a question put by the Houston partner, that if the decision were appealable it would make the findings required by 28 U.S.C. § 1292(b) (1964) to permit an interlocutory appeal under that section. After reflection, the Court requested the parties to brief the question of the appealability of its decision, citing Fleischer v. Phillips, 264 F.2d 515 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) and Harmar Drive-in Theatre, Inc. v. Warner Bros. Pictures, Inc., 239 F.2d 555 (2d Cir. 1956), cert. denied, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38 (1957).

Since asking the parties to brief the question of appealability, the Court has determined that this is an issue which should be severed pursuant to Rule 42(b), F.R.Civ.P. Accordingly, the entry of this memorandum opinion without discussion of the question of appealability should not be construed as foreclosing consideration of that issue. Should the Court subsequently determine that its decision is one appealable under § 1292(b), this memorandum opinion will be amended to incorporate the requisite findings.

prius proceedings await their termination by final judgment." DiBella v. United States, 369 U.S. 121, 124, 82 S.Ct. 654, 656, 7 L.Ed.2d 614 (1962). With respect to appeals to the Courts of Appeals, this principle is codified in 28 U.S. C. § 1291, which gives to those courts "jurisdiction of appeals from all final decisions of the district courts * * * except where a direct review may be had in the Supreme Court."

■ Because a pedantic requirement of finality may be oppressive, the general principle has been relaxed in a number of specific situations both by Congress and by the courts.[1] As applied to an order of disqualification, the relevant exceptions are the collateral order doctrine expounded in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Interlocutory Appeals Act codified as 28 U.S.C. § 1292(b), and the severance procedure authorized by Rule 54(b) of the Federal Rules of Civil Procedure.

■ Of course, 28 U.S.C. § 1291 and the Interlocutory Appeals Act are statutes granting jurisdiction to the courts of appeals, not to this Court. Whether these statutes confer jurisdiction of an appeal of an order of disqualification, therefore, is a question for the court of appeals, not for this Court. For the same reason, this Court expresses no opinion with reference to the availability of the collateral order doctrine in cases like this one. Rule 54(b) and the Interlocutory Appeals Act, however, grant to a district court the discretion to make findings relative to the need for a prompt appeal. Accordingly, this Court will now address this question and make the findings called for by the Rule and Act.

The question for consideration, therefore, is not whether an appeal can be permitted, but whether it should be. And on this question, the Court believes that all factors favor a prompt review of its decision. First, in the language of Rule 54(b), "there is no just reason for delay." A delayed appeal of this order of disqualification would be no appeal, for if plaintiff is required to obtain new counsel and try this suit before appealing the order of disqualification, the order will have become moot. Moreover, a principal reason for plaintiff's vigorous opposition to the motion is the delay and expense it will incur while new counsel are digesting the exhaustive files its present counsel have amassed; it would be unjust to subject plaintiff to this delay and expense as a price for an appeal of this order. And because two suits closely related to this one are now pending before another judge of this Court, and plaintiff is represented by the same counsel in each, it would be unjust to defer final resolution of the issues presented by the motion to disqualify its counsel here.

■ Secondly, the Court believes the issues presented by the motion to disqualify and resolved in the memorandum opinion to be "controlling question[s] of law as to which there is substantial ground for difference of opinion," as these terms are used in the Interlocutory Appeals Act, 28 U.S.C. § 1292(b). To be controlling, a question need not be dispositive. United States v. Woodbury, 263 F.2d 784 (9th Cir. 1959). Although the committee of the Judicial Conference of the United States which recommended enactment of the Interlocutory Appeals Act spoke of "question[s] which would be dispositive of the litigation,"[2] that committee relied on the report of a committee created by the Judicial Conference of the Tenth Circuit, which stated:

The shortening of the period between commencement of an action and its

---

1. DiBella v. United States, 369 U.S. 121, 124–126, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); Comment, Requiem for the Final Judgment Rule, 45 Texas L.Rev. 292 (1966); Note, Appealability in the Federal Courts, 75 Harv.L.Rev. 351 (1961).

2. The report of the Judicial Conference committee is appended as an exhibit to H.R.Rep. No. 1667, 85th Cong., 2d Sess. (1958), printed in 1958—3 U.S.Code Cong. & Admin.News, pp. 5255, 5260.

ultimate termination, together with the avoidance of unnecessary work and expense, are the imperative considerations which impel the committee's recommendation for change in the existing law.[3]

A "controlling" question, therefore, is properly one whose resolution may appreciably shorten the time, effort, and expense exhausted between the filing of a lawsuit and its termination. *Accord,* Joe Grasso & Son, Inc. v. United States, 42 F.R.D. 329, 334 (S.D.Tex.1966), aff'd, 380 F.2d 749 (5th Cir. 1967); Hendricks v. Alcoa S.S. Co., 206 F.Supp. 693 (E.D. Pa.1962). In the language of the Interlocutory Appeals Act itself, it is one whose resolution "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

▆▆▆ The Court believes that the issues presented by the motion to disqualify are, in this sense, controlling, because enforcement of the order of disqualification will delay proceedings for several months while plaintiff's new counsel digest the files already familiar to counsel of record. Moreover, since plaintiff's present counsel participated in the investigation preceding this litigation, they likely would require less extensive discovery than new counsel less familiar with the underlying facts. The Court therefore believes that an appeal from the order of disqualification will not significantly retard, and may materially advance the prosecution of this litigation.

Finally, although this Court has reached the firm conclusion that counsel should be disqualified, it is apparent from the record that many of the questions presented by the motion to disqualify are ones with respect to which there is some ground for difference of opinion. Some of the questions required the Court to weigh delicate issues of policy. On several, the commentators were in disagreement. Case authority is sparse on some of the questions.

In summary, this Court believes that this motion to disqualify raises issues which should be resolved before this case proceeds to judgment. The counsel and parties here, and the attorneys and prospective and present litigants in this Circuit need and are entitled to expect a definitive ruling on the important problems of professional ethics presented by the motion. The Court emphasizes that its opinion on the desirability of permitting an appeal is a creature of the distinctive features of this motion to disqualify. These features have caused it to enter the findings contained in this memorandum, and persuade it to grant plaintiff's motion to stay further proceedings pending appeal. Interlocutory appeals are luxuries which litigants and the judicial system can seldom afford, but the Court feels that in this case, a denial of an interlocutory appeal would prove even more costly.

Counsel for both parties are requested to frame an order or judgment consistent with the views expressed in this memorandum and in the memorandum opinion entered September 18, 1969, and to submit same within thirty days for entry. Should counsel find it impossible to agree on the form of an order or judgment, each shall submit memoranda within thirty days stipulating to as many terms as possible and explaining the reasons for their disagreement.

The Clerk will file this memorandum and send a copy to counsel for each party.

---

3. The report of the Tenth Circuit committee is also appended as an exhibit to the

House Report, *supra* note 2, at pp. 5261, 5262.