Karen TUTTLE, Plaintiff,

v.

COMBINED INSURANCE COMPANY, Defendant.

No. CIV. F–02–5419DLB.

United States District Court, E.D. California.

June 17, 2004.

Thornton Davidson, Fresno, CA, for plaintiff.

Michael E. Caples, Fitzgerald Abbott and Beardsley, Oakland, CA, for defendant.

## ORDER RE SANCTIONS

BECK, United States Magistrate Judge.

On January 23, 2004, this court issued an Order to Show Cause why sanctions should not be imposed against defendant Combined Insurance Company, its counsel Michael Caples and its representative attorney Elliot Hudsen (Respondents). A hearing on the Order to Show Cause was held on February 27, 2004 before the undersigned. Thornton Davidson appeared for plaintiff Karen Tuttle (Tuttle); Michael Caples and Elliot Hudsen appeared individually and on behalf of defendant Combined Insurance Company (Combined); and attorney Ronald Mallen specially appeared for Combined.

## I.

### *BACKGROUND*

A jury trial was held in this case beginning December 9, 2003 which resulted in a judgment in favor of Combined entered on December 18, 2003. During the trial, the following occurred regarding a witness for plaintiff, Ms. Marti Detrick, which was the subject of the January 23, 2004 Order to Show Cause:

On Wednesday, December 10, 2003, outside the presence of the jury, the following exchange took place during which Mr. Hudsen was present at counsel table:

MR. DAVIDSON: We've got an issue.

THE COURT: Which is?

MR. DAVIDSON: Marti Detrick, who we brought here today, paid for a plane ticket and we put her up in La Quinta. She checked out last night at 10:20 and appar-

ently has gone back to Oregon after talking to the company—Karen tried to call her last night and she said "Can't talk to you, they've been here. I have to leave."

MR. CAPLES: Indeed, Your Honor, I did meet with—

THE COURT: Lets take that up later. Okay?

December 10, 2003 Transcript 4:5–14.

MR. DAVIDSON: We need to take up this subject of Marti Detrick.

THE COURT: Why? Why can't it wait until two o'clock?

MR. DAVIDSON: Okay. Then that's going to create an interesting issue.

THE COURT: Which is?

MR. DAVIDSON: Well, she was my next witness.

THE COURT: Well, don't you have another one?

MR. DAVIDSON: Well, I could start with my client. I was trying to avoid that, but I guess—

THE COURT: Well, lets do that and not burn jury time wrestling with this because we're not going to have a solution. She's not here, right?

MR. DAVIDSON: I don't know.

THE COURT: Mr. Caples?

MR. CAPLES: I understand she is not here. I haven't talked to her.

December 10, 2003 Transcript 5:5–22. Thereafter, the jury was reconvened and the trial proceeded as scheduled until 2:00 p.m. when the jury was excused and the court allowed plaintiff to be heard on the issue of Marti Detrick. Mr. Caples and Mr. Hudsen, defendant's representative and also an attorney were both present. Mr. Davidson informed the court that his client had made arrangements for Marti Detrick, an employee of defendant to travel to Fresno to testify on behalf of plaintiff. Mr. Davidson represented that his client had been in direct contact with Ms. Detrick and that she was willing to testify on her behalf. Mr. Davidson represented that he had no direct contact with Ms. Detrick. Mr. Davidson then represented that his client had contacted Ms. Detrick the night before and Ms. Detrick in-

formed Ms. Tuttle that she had met with "the company" and that she could no longer speak to her. Mr. Davidson informed the court that he subsequently learned that Ms. Detrick had checked out of her hotel at approximately 10:30 p.m. the night before.

In response, Mr. Caples represented to the court that he was angry that Ms. Tuttle, the plaintiff was contacting defendant's employees. When he learned that Ms. Detrick was in Fresno he "went sideways" and called her. He represented that he called and met with her the evening before and they talked about her testimony but that she was not instructed to go home. He also represented to the court that if she had gone home, a fact which he did not know, she did so on her own. He stated, "She did what she did. And whatever she did, she did on her own." December 10, 2003 Transcript 12:16–17. Mr. Hudsen made no comment during the referenced proceedings.

The court advised the parties and counsel that it did not have enough information regarding the circumstances of Ms. Detrick's departure to make a determination of what action, if any, to take and then asked the parties if there would be any objection to the court speaking directly to Ms. Detrick on the sole issue of her departure from Fresno. The following exchange then occurred:

THE COURT: Well she's not here now [Marti Detrick].

MR. DAVIDSON: I don't know that she's not here . . . It would be useful to know that. Somehow I have a feeling she may have checked into the other hotel. Maybe that's something within Mr. Caples' purview. If she happens to be here, I would appreciate knowing. Because I will send service over to her and I will—

THE COURT: And while Mr. Caples has told me—I'm going to take him at his word that he doesn't know where she is.

MR. CAPLES: I'm not going to be coy about it. I'm assuming that she is and I believe that she probably is home. But it is true, I don't know.

THE COURT: Okay. Do you think that you could tell me before the end of the day whether my contacting Ms. Detrick is agreeable with both of you or not?

MR. CAPLES: Certainly. December 10, 2003 Transcript 22:1–19. Later the same day, Mr. Caples informed the court that he would not agree to the court contacting Ms. Detrick directly but instead, he would provide the court with a declaration from Ms. Detrick regarding the reasons and circumstances of her departure from Fresno. Mr. Davidson agreed to this procedure.

The following morning, prior to the start of the trial, Ms. Detrick telephoned the court and asked to speak directly to the undersigned. The court informed the parties of the call and thereafter spoke to Ms. Detrick. After the conservation, the court put Ms. Detrick's statement on the record. Ms Detrick thereafter provided a statement for the record advising the court that Ms. Tuttle had requested that she come to Fresno voluntarily as a witness and she agreed. She arrived Monday afternoon and stayed in a hotel. Tuesday evening, "corporate attorneys" contacted Ms. Detrick and wanted to meet with her. Ms. Detrick stated that Mr. Caples' associate, Ms. Graff, picked her up at her hotel and took her to the hotel where Mr. Caples was staying. She met with Mr. Caples, Ms. Graff and Mr. Hudsen. Ms. Detrick stated that "they" told her that she was brought to California in an "underhanded way" which was not fair to her or the company and that although they could force her to go home, it was her decision. She was with them for "a couple of hours" before they took her back to her hotel. She stated she was "tired and frustrated" and wanted to do the right thing. Later that night she called them and said, "Okay, I'll go home." Thereafter Mr. Hudsen made flight arrangements for Ms. Detrick to return home the following morning. Ms. Detrick also stated that Mr. Hudsen moved her to a different hotel that evening and the next morning (Wednesday) she flew home. Ms. Detrick stated that she felt "pressured" to go home.

Ms. Detrick further stated that she had received, via e-mail, a statement that Mr. Caples requested she sign and return to him. Ms. Detrick stated that the statement did not "cover the reason really [sic] that I left" and therefore she did not sign the statement and instead chose to call the undersigned direct-ly. Ms. Detrick then stated that she was willing to return to Fresno and testify.

Thereafter, the court ordered defendant to bring Ms. Detrick to Fresno to testify at trial, at its expense. On Friday, December 12, 2003, Ms. Detrick appeared in court and testified before the jury.

## II.

## DISCUSSION

### A. Legal Standard.

The following Local Rules of the Eastern District of California and California State Bar are at issue in this Order to Show Cause:

Local Rule 11–110:

Failure of counsel or of a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions authorized by statute or Rule or within the inherent power of the Court.

Local Rule 83–180(e):

(e) **Standards of Professional Conduct.** Every member of the Bar of this Court, and any attorney permitted to practice in this Court under subsection (b) shall become familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California and decisions of any Court applicable thereto, which are hereby adopted as standards of professional conduct in this Court. In the absence of an applicable standard therein, the Model Code of Professional Responsibility of the American Bar Association may be considered guidance. No attorney admitted to practice before this Court shall engage in any conduct which degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice.

California State Bar Rules of Professional Conduct Rule 5–200:

Trial Conduct. In presenting a matter to a tribunal, a member:

(A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth;

(B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law;

(C) Shall not intentionally misquote to a tribunal the language of a book, statute, or decision;

(D) Shall not, knowing its invalidity, cite as authority a decision that has been overruled or a statute that has been repealed or declared unconstitutional; and

(E) Shall not assert personal knowledge of the facts at issue, except when testifying as a witness.

California State Bar Rules of Professional Conduct Rule 5–310:

Prohibited Contact With Witnesses. A member shall not:

(A) Advise or directly or indirectly cause a person to secrete himself or herself or to leave the jurisdiction of a tribunal for the purpose of making that person unavailable as a witness therein.

(B) Directly or indirectly pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case. Except where prohibited by law, a member may advance, guarantee, or acquiesce in the payment of:

(1) Expenses reasonably incurred by a witness in attending or testifying.

(2) Reasonable compensation to a witness for loss of time in attending or testifying.

(3) A reasonable fee for the professional services of an expert witness.

■ Federal courts have inherent powers to manage their own proceedings and control the conduct of persons appearing before them. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27(1991), *reh'g denied,* 501 U.S. 1269, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991). By invoking the inherent power to punish bad faith conduct that threatens the integrity of the judicial process, a court must exercise discretion in fashioning appropriate sanctions. *See Chambers,* 501 U.S. at 44–45, 111 S.Ct. at 2132–2133. "District judges have an arsenal of sanctions they can impose for unethical behavior" including monetary sanctions, contempt, and disqualification of counsel. *Erickson v. Newmar Corp.,* 87 F.3d 298, 303 (9th Cir.1996). In order to impose sanctions under its inherent power, the court must make a specific finding that the attorney acted in bad faith. *Chambers* 501 U.S. at 44, 111 S.Ct. 2123; *Primus Automotive Fin'l Services, Inc. v. Batarse* 115 F.3d 644, 650 (9th Cir.1997).

■ An attorney admitted to the State Bar may be disciplined under the court's inherent power for conduct that violates the State Bar's rules of professional conduct, including conduct that occurs outside court. *United States v. Wunsch,* 84 F.3d 1110, 1114 (9th Cir.1996). The Ninth Circuit has not yet determined by what standard of proof the district court must make its bad faith determination. *See FJ Hanshaw Enterprises v. Emerald River Devel.,* 244 F.3d 1128, 1143 (9th Cir.2001); *In re Silberkraus,* 253 B.R. 890, 913 (Bankr.C.D.Cal.2000). However, other circuits have held that sanctions imposed under the court's inherent power are punitive in nature and are based on allegations of fraud or other quasi-criminal wrongdoing and therefore a heightened standard of proof applies: clear and convincing evidence of the abusive conduct is required; a mere preponderance of evidence is not enough. *See Shepherd v. American Broadcasting Cos., Inc.* 62 F.3d 1469, 1477 (D.C.Cir.1995); *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989). This Court need not decide what standard of proof is required because even if the clear and convincing standard applies, as discussed in more detail below, the Court finds that counsel's underlying predicate conduct has been proved by clear and convincing evidence.

## B. Caples' Representation of Ms. Detrick.

Respondents argue that neither of them engaged in any misconduct, the subject of

either Rule 5–200 or Rule 5–310 because Ms. Detrick was expressly represented by Combined and its counsel and Mr. Davidson knew that fact. Respondents have stated that they were outraged by what they perceived as patent misconduct on the part of Mr. Davidson in contacting "their client" and that is why they spoke to Ms. Detrick as described. Respondents concede that Ms. Detrick was not a represented party by virtue of her employment. Instead they assert that there was an *individual* attorney client privilege between Ms. Graff of Fitzgerald, Abbott & Beardsley and Ms. Detrick by virtue of their attending and defending her deposition. This assertion is incorrect and therefore the conduct which resulted from this belief was based on a misunderstanding of the law.

▇▇▇ Generally, there is no individual attorney-client privilege between a corporation's attorney and individuals within the corporation unless there is a clear showing that the individual consulted the corporate counsel in the officer's individual capacity. Five factors are considered in making this determination:

(1) Whether the employee approached counsel for the purpose of seeking legal advice;

(2) When she approached counsel, did she make it clear that she was seeking legal advice in her individual rather than representative capacity;

(3) Counsel saw fit to communicate with her in her individual capacity, knowing that a possible conflict could arise;

(4) Her conversations with counsel were confidential; and

(5) The substance of the conversations with counsel did not concern matters within the company or the general affairs of the company.

*In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 125 (3d Cir.1986). The employee must specifically request the personal representation because if she does not, the lawyer does not have the opportunity to consider possible conflicts of interest before agreeing to represent the employee. *See United States v. Keplinger*, 776 F.2d 678, 701, cert. denied, 476 U.S. 1183,

106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). The scope of the attorney client relationship hinges upon the client's belief that she is consulting a lawyer in that capacity and her manifested intention to seek professional advice. *Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7thCir.1078) cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). However, the employees' subjective belief alone that the attorneys represent them individually is not sufficient to create an attorney-client relationship. *Id.* Certainly an attorney's subjective belief alone that he or she represents an individual employee is insufficient to establish an attorney/client relationship.

▇▇ Here, none of the *Bevill* factors which support the existence of an attorney/client relationship are present. Ms. Detrick has stated that she never sought legal advice from Combined or its attorneys. Indeed, when Ms. Graff indicated that she was representing her at the deposition, Ms. Detrick questioned her ability to do so due to the potential conflict of interest. Mr. Caples argues that Ms. Detrick acknowledged the attorney client relationship in her testimony before the court. Transcript of Marti Detrick, 26:20–25. This was not the case. At the referenced portion of the transcript, Ms. Detrick was merely acknowledging that the Court had advised her that Mr. Caples had claimed that there was an attorney client relationship. At no time in her testimony did Ms. Detrick claim that Mr. Caples or anyone from his firm represented her or that she sought legal advice from them in a personal capacity.

Caples and Combined cite *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371 (S.D.Tex.1969) in support of their argument that an attorney/client relationship existed. *E.F. Hutton* does not support their argument. The facts in *E.F. Hutton* demonstrate the fallacy of their argument. In *E.F. Hutton*, the court held that attorneys representing a brokerage firm could not represent the firm in an action against Brown, a former vice president. The fact that the same attorney made a formal appearance at a hearing on behalf of Brown sufficed to preclude subsequent representation adverse to him. The attorney had rep-

resented and appeared with Brown (while he was still a vice president with E.F. Hutton) and other E.F. Hutton employees when they were called to testify in an SEC hearing. The same attorney also represented Brown and accompanied him when he appeared to testify at a related bankruptcy proceeding. The court stated that an attorney's appearance in judicial or semijudicial proceedings creates a presumption that an attorney-client relationship exists between the attorney and the person with whom he appears. *E.F. Hutton*, 305 F.Supp. at 387. The burden of persuasion then shifts to the party denying the existence of the relationship (the brokerage firm). *Id.* The court found that given the entry of a formal appearance by the attorney at the SEC hearing and the bankruptcy proceedings, the brokerage firm failed to overcome the presumption that the attorney represented the employee at those hearings. *Id.*

The most obvious difference between the *E.F. Hutton* and the present case is that here, the purported client denies the existence of the relationship. There is no evidence that Detrick ever approached Ms. Graff or Mr. Caples for the purpose of seeking legal advice, individually or otherwise. Indeed, Ms. Detrick indicates that when Ms. Graff purported to represent her, she pointed out to Ms. Graff before the deposition that there was a potential conflict of interest. Even if Ms. Graff's statement at the deposition were enough to raise a presumption of individual representation, the presumption is clearly rebutted by Ms. Detrick's statements. Ms. Detrick unequivocally stated both to this court and in her declaration that she never sought legal advice from Ms. Graff, Mr. Caples or Mr. Hudsen nor did she ever consider that they represented her. While Mr. Caples apparently informed Ms. Detrick that he represented her because she was an employee of Combined, this did not create an attorney/client relationship. Ms. Detrick never considered him to be her attorney. Mr. Caples' subjective belief that he represented Ms. Detrick clearly does not create an attorney client relationship. There is no authori-

ty for the proposition advanced by counsel that an attorney could represent a client against her wishes.

Accordingly, Combined's explanation for counsels' outrage at Mr. Davidson's conduct in contacting Ms. Detrick is based on a misinterpretation of the law regarding the attorney client privilege in the corporate context and is a red herring.

Indeed, this entire line of argument is a red herring. Respondents assume that if Ms. Detrick were their client it would be permissible to "advise or directly or indirectly cause a person to secrete himself or herself or to leave the jurisdiction of a tribunal for the purpose of making that person unavailable as a witness therein." California State Bar Rules of Professional Conduct Rule 5–310(A). There is no support for this argument and Rule 5–301(A) makes no exception where the witness is a client.

## C. The Meeting With Ms. Detrick Prior to Her Testimony.

█ In responding to the Court's Order to Show Cause, Mr. Caples states that when he learned that a person he believed he represented was brought secretly to Fresno to testify against his client, he became "angry." He argues he was deprived of the opportunity to discuss with Ms. Detrick whether she should voluntarily appear and whether that was in the interest of his client, her employer[1]. Mr. Caples states that he discussed the issue with Mr. Hudsen who in turn discussed the issue with the head of his law department. Because the contact and arrangements in having Detrick come to trial were perceived by them to be improper, they discussed directing her to return home but decided to allow her (Detrick) to decide whether she wanted to testify. Mr. Caples contends that he and Mr. Hudsen then met with Detrick and merely provided her with advice, albeit unsolicited, regarding her testimony. The same advice, they argue that they would have given her had Mr. Davidson advised them of his intent to call her as a

---

1. This argument illustrates the fallacy of Respondents' position. Mr. Caples was concerned about the interests of his client, Combined, not Ms. Detrick. Ms. Detrick never sought Caples' advice as to whether she should appear, she did so voluntarily.

witness (and had she asked for their advice). Mr. Hudsen, acting on behalf of Combined, admits telling Ms. Detrick, "I think I could tell you to go home" but he states he told her the company had "decided" not to and that the decision was hers. He also admits to expressing his anger and frustration and advising her that what Mr. Davidson had done was unfair to her and the company. Caples and Hudsen also told Ms. Detrick, that she should "do the right thing."

The troubling aspect of the meeting with Ms. Detrick is that based on her testimony, it is clear that whatever Mr. Caples and Mr. Hudsen said to her, their statements had the effect of persuading her to go home and to not testify. Ms. Graff picked Ms. Detrick up from her hotel and took her to counsels' hotel where three attorneys whom she knew represented her employer proceeded to tell her that the situation was unfair to the company and although they could force her to go how, they decided to let her make her own decision and she should do the right thing. Mr. Caples also told her that he was her attorney by virtue of her employment—which, as discussed, was not the case. Ms. Detrick stated that she simply wanted to "do the right thing" and after speaking the Mr. Caples, she believed the right thing was to go home. She said she felt "pressured" to go home and wondered if staying and testifying might adversely affect her job.

As noted, the Ninth Circuit has not specifically held that the clear and convincing standard of proof is required to award sanctions. However, even if the clear and convincing standard applies, the court finds that Mr. Caples' and Mr. Hudsen's (acting on behalf of Combined) conduct has been proved by clear and convincing evidence. Indeed, they do not dispute that they engaged in the conduct. Rather they only argue that the conduct was justified based on what they perceived to be misconduct on the part of Mr. Davidson. This perception was erroneous; but even if it were accurate, perceived

misconduct on the part of opposing counsel does not excuse retaliatory misconduct. Counsel's anger was revealed in such a way that Ms. Detrick felt pressured not to testify. The Court is not convinced by counsel's testimony that they did not intend to make Ms. Detrick unavailable. While their motivation appears to have been to retaliate against opposing counsel rather than out of fear that Ms. Detrick would harm their case, the effect was the same. Mr. Caples and Mr. Hudsen clearly used Ms. Detrick as a tool for retaliation against Mr. Davidson and thereby wrongfully influenced a witness in violation of Rule 5-310 and a clear example of bad faith conduct deserving of sanctions. *See Chambers v. NASCO, Inc., supra,* 501 U.S. at 45-46, 111 S.Ct. 2123. This conduct on the part of attorneys is particularly deplorable. Counsel's anger at Mr. Davidson or feeling that they had somehow been "wronged" does not allow them to abandon the ethics of their profession or engage in self help of the situation. If counsel truly believed that Mr. Davidson had committed misconduct, the situation should have been brought before the court. Instead Mr. Caples and Mr. Hudsen choose to resort to self help, they used poor judgment and their conduct was a discredit to the legal profession.

**D. Counsel's Courtroom Conduct.**

Mr. Hudsen argues that on December 10, 2003 he was appearing in court as a company representative of Combined and not as counsel and at the start of the court's inquiry regarding the whereabouts of Ms. Detrick, he took the passive role of a client, who was represented by counsel.[2] He argues that no questions were directed to him, he had a limited familiarity with the proceedings and he had a concern about waiving the attorney client privilege if he were to speak. He states that the only reason for Ms. Detrick changing hotels was to accommodate her early flight departure and after he dropped her off at the airport hotel, he did not speak to her again[3]. He defends his silence when

---

**2.** Mr. Hudsen cannot escape sanctions by arguing that he was not acting as counsel in this situation. The court clearly has the authority to order sanctions under its inherent power against

an attorney or a party. *See Chambers v. NASCO, Inc., supra,* 501 U.S. at 46, 111 S.Ct. 2123.

**3.** Ms. Detrick stated that she called Mr. Hudsen to inform him that she had decided to leave. In

Mr. Caples advised the Court that he did not know if Ms. Detrick had gone home, by stating that he believed that Ms. Detrick could very well again change her mind.

Mr. Caples contends that when the court asked whether Ms. Detrick was in Fresno, he responded truthfully the only way he could, "I understand she is not here. I haven't talked to her." He argues that the court sought no further information and he had no further information to give. He states, "Any and all information I had available to me regarding the court's inquiry in this matter I gave to the court at the time. I did not know where she was, but freely stated assumed she had gone home."

It is difficult to believe that Mr. Caples and Mr. Hudsen did not understand the Court's inquiry into Ms. Detrick's whereabouts to require them to provide all relevant information concerning the incidents of the prior evening. A review of the transcript, however, does not support the conclusion that they deliberately misled the Court. However one cannot help but wonder why, if Respondents were convinced they had done the right thing, they did not offer a more complete explanation of the events of the previous evening. Consciousness of guilt seems to be the most reasonable explanation.

## IV.

### SANCTIONS

Respondents' conduct very nearly resulted in unintended adverse consequences at trial for their client Combined. Plaintiff sought leave to introduce evidence of Respondents' conduct and requested an instruction concerning attempts to dissuade a witness. Clearly, had Ms. Detrick been unwilling to voluntarily return and testify or had it appeared to the Court that her testimony had been influenced by Respondents' conduct Plaintiff's motion might have properly been granted.

Having carefully considered the pleadings and evidence submitted in connection with this Order to Show Cause, the arguments of counsel and the relevant legal standards, the Court finds that sanctions are warranted. The Court finds that Respondents by their words and conduct directly or indirectly caused Ms. Detrick to leave the jurisdiction for the purpose of making her unavailable as a witness in this action. The court is mindful of the possible affect of sanctions on counsel who value their professional reputations but the failure to issue sanctions under these circumstances would serve as a message to other attorneys and parties that such conduct is acceptable. Finally, the Court hopes that sanctions will cause counsel to evaluate their standards of professional conduct and hopefully modify their future behavior. Accordingly, the Court HEREBY ORDERS as follows:

1. Mr. Caples shall pay sanctions in the amount of $5,000.00. Payment should be made payable to The Clerk of the Court. The sum is to be paid personally by Mr. Caples not later than twenty (20) days from the filing of this Order. This sanction is personal to Mr. Caples and is to be borne by him personally and is not to be transmitted to Combined by way of a charge of attorneys fees or costs;

2. Combined shall pay sanctions in the amount of $5,000.00 based on the conduct of their representative Elliot Hudsen. Payment should be made payable to the Clerk of the Court within twenty (20) days from the filing of this Order.

IT IS SO ORDERED.

this conversation she told him Plaintiff called her and he said he wanted to move Ms. Detrick to his hotel, which she declined and they compromised on a hotel near the airport.